ZAPATA CORPORATION, Defendant Below, Appellant,

v.

William MALDONADO, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted Dec. 31, 1980 *.

Decided May 13, 1981.

* The appeal was argued on Oct. 16, 1980 but certain procedural matters required by this Court were not accomplished until the date indicated.

Robert K. Payson, (argued) of Potter, Anderson & Corroon, Wilmington, and Thomas F. Curnin, Thomas J. Kavaler, P. Kevin Castel and Edward P. Krugman of Cahill, Gordon & Reindel, New York City, of counsel, for defendant-appellant.

Charles F. Richards, Jr. of Richards, Layton & Finger, Wilmington, for individual defendants.

Irving Morris and Joseph A. Rosenthal of Morris & Rosenthal, Wilmington, Sidney L. Garwin (argued), and Bruce E. Gerstein of Garwin, Bronzaft & Gerstein, New York City, of counsel, for plaintiff-appellee.

Arthur G. Connolly, Jr. of Connolly, Bove & Lodge, Wilmington, for amici curiae.

Before DUFFY, QUILLEN and HORSEY, JJ.

QUILLEN, Justice:

This is an interlocutory appeal from an order entered on April 9, 1980, by the Court of Chancery denying appellant-defendant Zapata Corporation's (Zapata) alternative motions to dismiss the complaint or for summary judgment. The issue to be addressed has reached this Court by way of a rather convoluted path.

In June, 1975, William Maldonado, a stockholder of Zapata, instituted a derivative action in the Court of Chancery on behalf of Zapata against ten officers and/or directors of Zapata, alleging, essentially, breaches of fiduciary duty. Maldonado did not first demand that the board bring this action, stating instead such demand's futility because all directors were named as defendants and allegedly participated in the acts specified.[1] In June, 1977, Maldonado commenced an action in the United States District Court for the Southern District of New York against the same defendants, save one, alleging federal security law violations as well as the same common law claims made previously in the Court of Chancery.

---

1. Court of Chancery Rule 23.1 states in part: "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort."

By June, 1979, four of the defendant-directors were no longer on the board, and the remaining directors appointed two new outside directors to the board. The board then created an "Independent Investigation Committee" (Committee), composed solely of the two new directors, to investigate Maldonado's actions, as well as a similar derivative action then pending in Texas, and to determine whether the corporation should continue any or all of the litigation. The Committee's determination was stated to be "final, . . . not . . . subject to review by the Board of Directors and . . . in all respects . . . binding upon the Corporation."

Following an investigation, the Committee concluded, in September, 1979, that each action should "be dismissed forthwith as their continued maintenance is inimical to the Company's best interests . . . ." Consequently, Zapata moved for dismissal or summary judgment in the three derivative actions. On January 24, 1980, the District Court for the Southern District of New York granted Zapata's motion for summary judgment, *Maldonado v. Flynn*, S.D.N.Y., 485 F.Supp. 274 (1980), holding, under its interpretation of Delaware law, that the Committee had the authority, under the "business judgment" rule, to require the termination of the derivative action. Maldonado appealed that decision to the Second Circuit Court of Appeals.

On March 18, 1980, the Court of Chancery, in a reported opinion, the basis for the order of April 9, 1980, denied Zapata's motions, holding that Delaware law does not sanction this means of dismissal. More specifically, it held that the "business judgment" rule is not a grant of authority to dismiss derivative actions and that a stockholder has an individual right to maintain derivative actions in certain instances.

*Maldonado v. Flynn*, Del.Ch., 413 A.2d 1251 (1980) (herein *Maldonado*). Pursuant to the provisions of Supreme Court Rule 42, Zapata filed an interlocutory appeal with this Court shortly thereafter. The appeal was accepted by this Court on June 5, 1980. On May 29, 1980, however, the Court of Chancery dismissed Maldonado's cause of action, its decision based on principles of *res judicata*, expressly conditioned upon the Second Circuit affirming the earlier New York District Court's decision.[2] The Second Circuit appeal was ordered stayed, however, pending this Court's resolution of the appeal from the April 9th Court of Chancery order denying dismissal and summary judgment.

Thus, Zapata's observation that it sits "in a procedural gridlock" appears quite accurate, and we agree that this Court can and should attempt to resolve the particular question of Delaware law.[3] As the Vice Chancellor noted, 413 A.2d at 1257, "it is the law of the State of incorporation which determines whether the directors have this power of dismissal, *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979)". We limit our review in this interlocutory appeal to whether the Committee has the power to cause the present action to be dismissed.

We begin with an examination of the carefully considered opinion of the Vice Chancellor which states, in part, that the "business judgment" rule does not confer power "to a corporate board of directors to terminate a derivative suit", 413 A.2d at 1257. His conclusion is particularly pertinent because several federal courts, applying Delaware law, have held that the business judgment rule enables boards (or their committees) to terminate derivative suits, decisions now in conflict with the holding below.[4]

---

**2.** *Maldonado v. Flynn*, Del.Ch., 417 A.2d 378 (1980). Proceedings in the Trial Court are not automatically stayed during the pendency of an interlocutory appeal. Supreme Court Rule 42(d).

**3.** The District Court for the Southern District of Texas, in *Maher v. Zapata Corp.*, S.D.Tex., 490 F.Supp. 348 (1980), denied Zapata's motions to dismiss or for summary judgment in an opinion consistent with *Maldonado*.

**4.** *Abbey v. Control Data Corp.*, 8th Cir., 603 F.2d 724 (1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980); *Lewis v. Adams*, N.D.Okl., No. 77–266C (November 15, 1979); *Siegal v. Merrick*, S.D.N.Y., 84 F.R.D. 106 (1979); and, of course, *Maldonado v. Flynn*, S.D.N.Y., 485 F.Supp. 274 (1980). See

As the term is most commonly used, and given the disposition below, we can understand the Vice Chancellor's comment that "the business judgment rule is irrelevant to the question of whether the Committee has the authority to compel the dismissal of this suit". 413 A.2d at 1257. Corporations, existing because of legislative grace, possess authority as granted by the legislature. Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation,[5] from 8 *Del.C.* § 141 (a).[6] This statute is the fount of directorial powers. The "business judgment" rule is a judicial creation that presumes propriety, under certain circumstances, in a board's decision.[7] Viewed defensively, it does not create authority. In this sense the "business judgment" rule is not relevant in corporate decision making until after a decision is made. It is generally used as a defense to an attack on the decision's soundness. The board's managerial decision making power, however, comes from § 141(a). The judicial creation and legislative grant are related because the "business judgment" rule evolved to give recognition and deference to directors' business expertise when exercising their managerial power under § 141(a).

In the case before us, although the corporation's decision to move to dismiss or for summary judgment was, literally, a decision resulting from an exercise of the directors' (as delegated to the Committee) business judgment, the question of "business judgment", in a defensive sense, would not become relevant until and unless the decision

to seek termination of the derivative lawsuit was attacked as improper. *Maldonado*, 413 A.2d at 1257. Accord, *Abella v. Universal Leaf Tobacco Co., Inc.*, E.D.Va., 495 F.Supp. 713 (1980) (applying Virginia law); *Maher v. Zapata Corp.*, S.D.Tex., 490 F.Supp. 348 (1980) (applying Delaware law). See also, Dent, *supra* note 5, 75 Nw.U.L. Rev. at 101–02, 135. This question was not reached by the Vice Chancellor because he determined that the stockholder had an individual right to maintain this derivative action. *Maldonado*, 413 A.2d at 1262.

Thus, the focus in this case is on the power to speak for the corporation as to whether the lawsuit should be continued or terminated. As we see it, this issue in the current appellate posture of this case has three aspects: the conclusions of the Court below concerning the continuing right of a stockholder to maintain a derivative action; the corporate power under Delaware law of an authorized board committee to cause dismissal of litigation instituted for the benefit of the corporation; and the role of the Court of Chancery in resolving conflicts between the stockholder and the committee.

Accordingly, we turn first to the Court of Chancery's conclusions concerning the right of a plaintiff stockholder in a derivative action. We find that its determination that a stockholder, once demand is made and refused, possesses an independent, individual right to continue a derivative suit for breaches of fiduciary duty over objection by the corporation, *Maldonado*, 413 A.2d at 1262–63, as an absolute rule, is erroneous. The Court of Chancery relied principally upon *Sohland v. Baker*, Del.Supr., 141 A.

---

also *Abramowitz v. Posner*, S.D.N.Y., 513 F.Supp. 120, (1981) which specifically rejected the result reached by the Vice Chancellor in this case.

**5.** See Dent, *The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?* 75 Nw.U.L.Rev. 96, 98 & n. 14 (1980); Comment, *The Demand and Standing Requirements in Stockholder Derivative Actions*, 44 U.Chi.L.Rev. 168, 192 & nn. 153–54 (1976) (herein *Stockholder Derivative Actions*).

**6.** 8 *Del.C.* § 141(a) states:

"The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation."

**7.** See Arsht, *The Business Judgment Rule Revisited*, 8 Hofstra L.Rev. 93, 97, 130–33 (1979).

277 (1927), for this statement of the Delaware rule. *Maldonado*, 413 A.2d at 1260–61. *Sohland* is sound law. But *Sohland* cannot be fairly read as supporting the broad proposition which evolved in the opinion below.

In *Sohland*, the complaining stockholder was allowed to file the derivative action in equity after making demand and after the board refused to bring the lawsuit. But the question before us relates to the power of the corporation by motion to terminate a lawsuit properly commenced by a stockholder without prior demand. No Delaware statute or case cited to us directly determines this new question and we do not think that *Sohland* addresses it by implication.

The language in *Sohland* relied on by the Vice Chancellor negates the contention that the case stands for the broad rule of stockholder right which evolved below. This Court therein stated that "a stockholder *may sue* in his own name for the purpose of enforcing corporate rights . . . in a proper case if the corporation on the demand of the stockholder refuses to bring suit." 141 A. at 281 (emphasis added). The Court also stated that "whether ["[t]he right of a stockholder *to file a bill* to litigate corporate rights"] exists necessarily depends on the facts of each particular case." 141 A. at 282 (emphasis added). Thus, the precise language only supports the stockholder's right to initiate the lawsuit. It does not support an absolute right to continue to control it.

Additionally, the issue and context in *Sohland* are simply different from this case. Baker, a stockholder, suing on behalf of Bankers' Mortgage Co., sought cancellation of stock issued to Sohland, a director of Bankers', in a transaction participated in by a "great majority" of Bankers' board. Before instituting his suit, Baker requested the board to assert the cause of action. The board refused. Interestingly, though, on the same day the board refused, it authorized payment of Baker's attorneys fees so that he could pursue the claim; one director actually escorted Baker to the attorneys suggested by the board. At this chronological point, Sohland had resigned from the board, and it was he, not the board, who was protesting Baker's ability to bring suit. In sum, despite the board's refusal to bring suit, it is clear that the board supported Baker in his efforts.[8] It is not surprising then that he was allowed to proceed as the corporation's representative "for the prevention of injustice", because "the corporation itself refused to litigate an apparent corporate right." 141 A. at 282.

Moreover, *McKee v. Rogers*, Del.Ch., 156 A. 191 (1931), stated "as a general rule" that "a stockholder cannot be permitted . . . to invade the discretionary field committed to the judgment of the directors and sue in the corporation's behalf when the managing body refuses. This rule is a well settled one." 156 A. at 193.[9]

The *McKee* rule, of course, should not be read so broadly that the board's refusal will be determinative in every instance. Board members, owing a well-established fiduciary duty to the corporation, will not be allowed to cause a derivative suit to be dismissed when it would be a breach of their fiduciary duty. Generally

---

**8.** Compare *Baker v. Bankers' Mortgage Co.*, Del.Ch., 129 A. 775, 776–77 (1925), the lower *Sohland*. In *Baker*, Chancellor Wolcott posed a rhetorical question that is entirely consistent with the result we reach today: "[W]hy should not a stockholder, if the managing body absolutely refuses to act, be permitted to assert on behalf of himself and other stockholders a complaint, not against matters lying in sound discretion and honest judgment, but against frauds perpetrated by an officer in clear breach of his trust?" 129 A. at 777.

**9.** To the extent that *Mayer v. Adams*, Del. Supr., 141 A.2d 458, 462 (1958) and *Ainscow v. Sanitary Co. of America*, Del.Ch., 180 A. 614, 615 (1935), relied upon in *Maldonado*, 413 A.2d at 1262, contain language relating to the rule in *McKee*, we note that each decision is dissimilar from the one we examine today. *Mayer* held that demand on the stockholders was not required before maintaining a derivative suit if the wrong alleged could not be ratified by the stockholders. *Ainscow* found defective a complaint that neither alleged demand on the directors, nor reasons why demand was excusable.

disputes pertaining to control of the suit arise in two contexts.

■ Consistent with the purpose of requiring a demand, a board decision to cause a derivative suit to be dismissed as detrimental to the company, after demand has been made and refused, will be respected unless it was wrongful.[10] See, e. g., *United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263–64, 37 S.Ct. 509, 510, 61 L.Ed. 1119, 1124 (1917); *Stockholder Derivative Actions, supra* note 5, 44 U.Chi. L.Rev. at 169, 191–92; Note, *Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit*, 73 Har.L.Rev. 746, 748, 759 (1960); 13 W. Fletcher, Cyclopedia of the Law of Private Corporations § 5969 (rev.perm.ed. 1980). A claim of a wrongful decision not to sue is thus the first exception and the first context of dispute. Absent a wrongful refusal, the stockholder in such a situation simply lacks legal managerial power. Compare *Maldonado*, 413 A.2d at 1259–60.

■ But it cannot be implied that, absent a wrongful board refusal, a stockholder can never have an individual right to initiate an action. For, as is stated in *McKee*, a "well settled" exception exists to the general rule.

"[A] stockholder may sue in equity in his derivative right to assert a cause of action in behalf of the corporation, *without prior demand* upon the directors to sue, when it is apparent that a demand would be futile, that the officers are under an influence that sterilizes discretion and could not be proper persons to conduct the litigation."

156 A. at 193 (emphasis added). This exception, the second context for dispute, is consistent with the Court of Chancery's statement below, that "[t]he stockholders' individual right to bring the action does not ripen, however, . . . unless he can show a demand to be futile." *Maldonado*, 413 A.2d at 1262.[11]

These comments in *McKee* and in the opinion below make obvious sense. A demand, when required and refused (if not wrongful), terminates a stockholder's legal ability to initiate a derivative action.[12] But where demand is properly excused, the stockholder does possess the ability to initiate the action on his corporation's behalf.

■ These conclusions, however, do not determine the question before us. Rather, they merely bring us to the question to be decided. It is here that we part company with the Court below. Derivative suits enforce corporate rights and any recovery obtained goes to the corporation. *Taormina v. Taormina Corp.*, Del.Ch., 78 A.2d 473, 476 (1951); *Keenan v. Eshleman*, Del.Supr., 2 A.2d 904, 912–13 (1938). "The right of a stockholder to file a bill to litigate corporate rights is, therefore, solely for the purpose of preventing injustice where it is apparent that material corporate rights would not otherwise be protected." *Sohland*, 141 A. at 282. We see no inherent reason why the "two phases" of a derivative suit, the stockholder's suit to compel the corporation to sue and the corporation's suit (see 413 A.2d at 1261–62), should automatically result in the placement in the hands of the

---

10. In other words, when stockholders, after making demand and having their suit rejected, attack the board's decision as improper, the board's decision falls under the "business judgment" rule and will be respected if the requirements of the rule are met. See Dent, *supra* note 5, 75 Nw.U.L.Rev. at 100–01 & nn. 24–25. That situation should be distinguished from the instant case, where demand was not made, and the *power* of the board to seek a dismissal, due to disqualification, presents a threshold issue. For examples of what has been held to be a wrongful decision not to sue, see *Stockholder Derivative Actions, supra* note 5, 44 U.Chi.L. Rev. at 193–98. We recognize that the two contexts can overlap in practice.

11. These statements are consistent with Rule 23.1's "reasons for . . . failure" to make demand. See also the other cases cited by the Vice Chancellor, 413 A.2d at 1262: *Ainscow v. Sanitary Co. of America, supra* note 9, 180 A. at 615; *Mayer v. Adams, supra* note 9, 141 A.2d at 462; *Dann v. Chrysler Corp.*, Del.Ch., 174 A.2d 696, 699–700 (1961).

12. Even in this situation, it may take litigation to determine the stockholder's lack of power, i. e., standing.

litigating stockholder sole control of the corporate right throughout the litigation. To the contrary, it seems to us that such an inflexible rule would recognize the interest of one person or group to the exclusion of all others within the corporate entity. Thus, we reject the view of the Vice Chancellor as to the first aspect of the issue on appeal.

The question to be decided becomes: When, if at all, should an authorized board committee be permitted to cause litigation, properly initiated by a derivative stockholder in his own right, to be dismissed? As noted above, a board has the power to choose not to pursue litigation when demand is made upon it, so long as the decision is not wrongful. If the board determines that a suit would be detrimental to the company, the board's determination prevails. Even when demand is excusable, circumstances may arise when continuation of the litigation would not be in the corporation's best interests. Our inquiry is whether, under such circumstances, there is a permissible procedure under § 141(a) by which a corporation can rid itself of detrimental litigation. If there is not, a single stockholder in an extreme case might control the destiny of the entire corporation. This concern was bluntly expressed by the Ninth Circuit in *Lewis v. Anderson*, 9th Cir., 615 F.2d 778, 783 (1979), *cert. denied*, —— U.S. ——, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980): "To allow one shareholder to inca-pacitate an entire board of directors merely by leveling charges against them gives too much leverage to dissident shareholders." But, when examining the means, including the committee mechanism examined in this case, potentials for abuse must be recognized. This takes us to the second and third aspects of the issue on appeal.

■ Before we pass to equitable considerations as to the mechanism at issue here, it must be clear that an independent committee possesses the corporate power to seek the termination of a derivative suit. Section 141(c) allows a board to delegate all of its authority to a committee.[13] Accordingly, a committee with properly delegated authority would have the power to move for dismissal or summary judgment if the entire board did.

■ Even though demand was not made in this case and the initial decision of whether to litigate was not placed before the board, Zapata's board, it seems to us, retained all of its corporate power concerning litigation decisions. If Maldonado had made demand on the board in this case, it could have refused to bring suit. Maldonado could then have asserted that the decision not to sue was wrongful and, if correct, would have been allowed to maintain the suit. The board, however, never would have lost its statutory managerial authority. The demand requirement itself evidences that the managerial power is re-

**13.** 8 *Del.C.* § 141(c) states:

"The board of directors may, by resolution passed by a majority of the whole board, designate 1 or more committees, each committee to consist of 1 or more of the directors of the corporation. The board may designate 1 or more directors as alternative members of any committee, who may replace any absent or disqualified member at any meeting of the committee. The bylaws may provide that in the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the board of directors, or in the bylaws of the corporation, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the certificate of incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the corporation's property and assets, recommending to the stockholders a dissolution of the corporation or a revocation of a dissolution, or amending the bylaws of the corporation; and, unless the resolution, bylaws, or certificate of incorporation expressly so provide, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock."

tained by the board. When a derivative plaintiff is allowed to bring suit after a wrongful refusal, the board's authority to choose whether to pursue the litigation is not challenged although its conclusion—reached through the exercise of that authority—is not respected since it is wrongful. Similarly, Rule 23.1, by excusing demand in certain instances, does not strip the board of its corporate power. It merely saves the plaintiff the expense and delay of making a futile demand resulting in a probable tainted exercise of that authority in a refusal by the board or in giving control of litigation to the opposing side. But the board entity remains empowered under § 141(a) to make decisions regarding corporate litigation. The problem is one of member disqualification, not the absence of power in the board.

■ The corporate power inquiry then focuses on whether the board, tainted by the self-interest of a majority of its members, can legally delegate its authority to a committee of two disinterested directors. We find our statute clearly requires an affirmative answer to this question. As has been noted, under an express provision of the statute, § 141(c), a committee can exercise all of the authority of the board to the extent provided in the resolution of the board. Moreover, at lest by analogy to our statutory section on interested directors, 8 *Del.C.* § 141, it seems clear that the Delaware statute is designed to permit disinter-

ested directors to act for the board.[14] Compare *Puma v. Marriott*, Del.Ch., 283 A.2d 693, 695–96 (1971).

We do not think that the interest taint of the board majority is per se a legal bar to the delegation of the board's power to an independent committee composed of disinterested board members. The committee can properly act for the corporation to move to dismiss derivative litigation that is believed to be detrimental to the corporation's best interest.

Our focus now switches to the Court of Chancery which is faced with a stockholder assertion that a derivative suit, properly instituted, should continue for the benefit of the corporation and a corporate assertion, properly made by a board committee acting with board authority, that the same derivative suit should be dismissed as inimical to the best interests of the corporation.

At the risk of stating the obvious, the problem is relatively simple. If, on the one hand, corporations can consistently wrest bona fide derivative actions away from well-meaning derivative plaintiffs through the use of the committee mechanism, the derivative suit will lose much, if not all, of its generally-recognized effectiveness as an intra-corporate means of policing boards of directors. See Dent, *supra* note 5, 75 Nw.U. L.Rev. at 96 & n. 3, 144 & n. 241. If, on the other hand, corporations are unable to rid themselves of meritless or harmful litiga-

---

14. 8 *Del.C.* § 144 states:

"§ 144. Interested directors; quorum.

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract

or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) The contract or transaction is fair to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee, or the shareholders.

(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction."

tion and strike suits, the derivative action, created to benefit the corporation, will produce the opposite, unintended result. For a discussion of strike suits, see Dent, *supra*, 75 Nw.U.L.Rev. at 137. See also *Cramer v. General Telephone & Electronics Corp.*, 3d Cir., 582 F.2d 259, 275 (1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). It thus appears desirable to us to find a balancing point where bona fide stockholder power to bring corporate causes of action cannot be unfairly trampled on by the board of directors, but the corporation can rid itself of detrimental litigation.

As we noted, the question has been treated by other courts as one of the "business judgment" of the board committee. If a "committee, composed of independent and disinterested directors, conducted a proper review of the matters before it, considered a variety of factors and reached, in good faith, a business judgment that [the] action was not in the best interest of [the corporation]", the action must be dismissed. See, e. g., *Maldonado v. Flynn, supra*, 485 F.Supp. at 282, 286. The issues become solely independence, good faith, and reasonable investigation. The ultimate conclusion of the committee, under that view, is not subject to judicial review.

We are not satisfied, however, that acceptance of the "business judgment" rationale at this stage of derivative litigation is a proper balancing point. While we admit an analogy with a normal case respecting board judgment, it seems to us that there is sufficient risk in the realities of a situation like the one presented in this case to justify caution beyond adherence to the theory of business judgment.

The context here is a suit against directors where demand on the board is excused. We think some tribute must be paid to the fact that the lawsuit was properly initiated. It is not a board refusal case. Moreover, this complaint was filed in June of 1975 and, while the parties undoubtedly would take differing views on the degree of litigation activity, we have to be concerned about the creation of an "Independent Investigation Committee" four years later, after the election of two new outside directors. Situations could develop where such motions could be filed after years of vigorous litigation for reasons unconnected with the merits of the lawsuit.

Moreover, notwithstanding our conviction that Delaware law entrusts the corporate power to a properly authorized committee, we must be mindful that directors are passing judgment on fellow directors in the same corporation and fellow directors, in this instance, who designated them to serve both as directors and committee members. The question naturally arises whether a "there but for the grace of God go I" empathy might not play a role. And the further question arises whether inquiry as to independence, good faith and reasonable investigation is sufficient safeguard against abuse, perhaps subconscious abuse.

There is another line of exploration besides the factual context of this litigation which we find helpful. The nature of this motion finds no ready pigeonhole, as perhaps illustrated by its being set forth in the alternative. It is perhaps best considered as a hybrid summary judgment motion for dismissal because the stockholder plaintiff's standing to maintain the suit has been lost. But it does not fit neatly into a category described in Rule 12(b) of the Court of Chancery Rules nor does it correspond directly with Rule 56 since the question of genuine issues of fact on the merits of the stockholder's claim are not reached.

It seems to us that there are two other procedural analogies that are helpful in addition to reference to Rules 12 and 56. There is some analogy to a settlement in that there is a request to terminate litigation without a judicial determination of the merits. See *Perrine v. Pennroad Corp.*, Del. Supr., 47 A.2d 479, 487 (1946). "In determining whether or not to approve a proposed settlement of a derivative stockholders' action [when directors are on both sides of the transaction], the Court of Chancery is called upon to exercise its own business judgment." *Neponsit Investment Co. v. Abramson*, Del.Supr., 405 A.2d 97, 100 (1979) and cases therein cited. In this case,

the litigating stockholder plaintiff facing dismissal of a lawsuit properly commenced ought, in our judgment, to have sufficient status for strict Court review.

Finally, if the committee is in effect given status to speak for the corporation as the plaintiff in interest, then it seems to us there is an analogy to Court of Chancery Rule 41(a)(2) where the plaintiff seeks a dismissal after an answer. Certainly, the position of record of the litigating stockholder is adverse to the position advocated by the corporation in the motion to dismiss. Accordingly, there is perhaps some wisdom to be gained by the direction in Rule 41(a)(2) that "an action shall not be dismissed at the plaintiff's instance save upon order of the Court and upon such terms and conditions as the Court deems proper."

Whether the Court of Chancery will be persuaded by the exercise of a committee power resulting in a summary motion for dismissal of a derivative action, where a demand has not been initially made, should rest, in our judgment, in the independent discretion of the Court of Chancery. We thus steer a middle course between those cases which yield to the independent business judgment of a board committee and this case as determined below which would yield to unbridled plaintiff stockholder control. In pursuit of the course, we recognize that "[t]he final substantive judgment whether a particular lawsuit should be maintained requires a balance of many factors—ethical, commercial, promotional, public relations, employee relations, fiscal as well as legal." *Maldonado v. Flynn, supra,* 485 F.Supp. at 285. But we are content that such factors are not "beyond the judicial reach" of the Court of Chancery which regularly and competently deals with fiduciary relationships, disposition of trust property, approval of settlements and scores of similar problems. We recognize the danger of judicial overreaching but the alternatives seem to us to be outweighed by the fresh view of a judicial outsider. Moreover, if we failed to balance all the interests involved, we would in the name of practicality and judicial economy foreclose a judicial decision on the merits. At this point, we are not convinced that is necessary or desirable.

■ After an objective and thorough investigation of a derivative suit, an independent committee may cause its corporation to file a pretrial motion to dismiss in the Court of Chancery. The basis of the motion is the best interests of the corporation, as determined by the committee. The motion should include a thorough written record of the investigation and its findings and recommendations. Under appropriate Court supervision, akin to proceedings on summary judgment, each side should have an opportunity to make a record on the motion. As to the limited issues presented by the motion noted below, the moving party should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law.[15] The Court should apply a two-step test to the motion.

■ First, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions. Limited discovery may be ordered to facilitate such inquiries.[16] The corporation should have the burden of proving independence, good faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness.[17]

15. We do not foreclose a discretionary trial of factual issues but that issue is not presented in this appeal. See *Lewis v. Anderson, supra,* 615 F.2d at 780. Nor do we foreclose the possibility that other motions may proceed or be joined with such a pretrial summary judgment motion to dismiss, e. g., a partial motion for summary judgment on the merits.

16. See, e. g., *Galef v. Alexander,* 2d Cir., 615 F.2d 51, 56 (1980); *Maldonado v. Flynn, supra,* 485 F.Supp. at 285–86; *Rosengarten v. Interna-* *tional Telephone & Telegraph Corp.,* S.D.N.Y., 466 F.Supp. 817; 823 (1979); *Gall v. Exxon Corp.,* S.D.N.Y., 418 F.Supp. 508, 520 (1976). Compare Dent, *supra* note 5, 75 Nw.U.L.Rev. at 131–33.

17. Compare *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 928–29, 393 N.E.2d 994 (1979). Our approach here is analogous to and consistent with the Delaware approach to "interested director" transactions, where the directors, once the transaction is attacked, have

If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions, or, if the Court is not satisfied for other reasons relating to the process, including but not limited to the good faith of the committee, the Court shall deny the corporation's motion. If, however, the Court is satisfied under Rule 56 standards that the committee was independent and showed reasonable bases for good faith findings and recommendations, the Court may proceed, in its discretion, to the next step.

The second step provides, we believe, the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee. The Court should determine, applying its own independent business judgment, whether the motion should be granted.[18] This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied. The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest. The Court of Chancery of course must carefully consider and weigh how compelling the corporate interest in dismissal is when faced with a non-frivolous lawsuit. The Court of Chancery should, when appropriate, give special consideration to matters of law and public policy in addition to the corporation's best interests.

If the Court's independent business judgment is satisfied, the Court may proceed to grant the motion, subject, of course, to any equitable terms or conditions the Court finds necessary or desirable.

The interlocutory order of the Court of Chancery is reversed and the cause is remanded for further proceedings consistent with this opinion.

the burden of establishing its "intrinsic fairness" to a court's careful scrutiny. See, e. g., *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107 (1952).

18. This step shares some of the same spirit and philosophy of the statement by the Vice Chancellor: "Under our system of law, courts and not litigants should decide the merits of litigation." 413 A.2d at 1263.