LEWIS POWELL, Indiv. and as member of Menard Electric Cooperative, *et al.*, Plaintiffs-Appellants, v. WESTERN ILLINOIS ELECTRIC COOPERATIVE *et al.*, Defendants-Appellees (Illinois Power Company, Inc., Defendant).

Fourth District   No. 4—88—0355

Opinion filed March 17, 1989.—Rehearing denied April 17, 1989.

James C. Craven, of James C. Craven, P.C., and Thomas F. Londrigan and Gordon W. Gates, both of Londrigan, Potter & Randle, P.C., both of Springfield, for appellants.

Thomas E. Wack, Deborah Bell Yates, and Peter W. Herzog, all of Bryan, Cave, McPheeters & McRoberts, of St. Louis, Missouri, for appellees.

JUSTICE LUND delivered the opinion of the court:

On September 22, 1986, plaintiffs Lewis Powell and others filed a derivative action against nominal defendants Western Illinois Power Cooperative (WIPCO) and Soyland Power Cooperative, Inc. (Soyland), and real defendant Illinois Power Company, Inc. (IP). The derivative action resulted from the failure or delay of WIPCO and Soyland to bring action against IP for alleged wrongdoing by IP in the construction of the nuclear power plant near Clinton, Illinois (Clinton Nuclear Station). After various motions and pleading procedures, including an amended complaint by plaintiffs on March 13, 1987, WIPCO and Soyland moved to be realigned as plaintiffs and asked that the original plaintiffs be dismissed as to all of the derivative counts. Plaintiffs objected, contending their amended pleadings suggested a conflict of interest existed with WIPCO and Soyland directors preventing proper determination of litigation matters. The trial court ordered a good-faith hearing, placing the burden on plaintiffs to establish the lack of good faith on the part of WIPCO and Soyland's board of directors. On January 7, 1988, the trial court denied pending motions and found plaintiffs failed to establish that the present board of directors suffered from a conflict of interest or acted in bad faith. An order was entered realigning the derivative defendants as plaintiffs and dismissing plaintiffs from the derivative action counts. This appeal followed.

From cases cited and from our additional research, it appears we are dealing with a case of first impression in the State of Illinois. Often, derivative actions are brought because of alleged specific wrongdoing by corporate management and directors. WIPCO and Soyland are cooperatives but, for purposes of this action, are treated as corporations.

Various rural electric cooperatives, serving rural Illinois, created WIPCO and Soyland for purposes of most economically obtaining electrical power supplies for the various distribution coops. The distribution coops do not and, for practical purposes, cannot produce the power they sell directly to their consumers.

The WIPCO and Soyland board of directors are elected by the di-

rectors of the various distribution coops. The directors of the distribution coops, in turn, are elected from the membership of their respective coops. The membership is composed of the coops' power consumers.

The present action evolved from a 1976 partnership agreement between WIPCO and Soyland on one hand and IP on the other. The initial agreement provided for IP to own 80% of the Clinton Nuclear Station, with Soyland owning 10.5% and WIPCO owning 9.5%. The original estimated cost for the Clinton Nuclear Station was $400 million. The final cost, evidently, exceeded $4 billion. The overrun on cost brought WIPCO and Soyland to the brink of bankruptcy. Many distribution coops were faced with unanticipated large rate increases.

In 1983 and 1984, as a result of the financial disaster facing WIPCO and Soyland, an agreement evolved between WIPCO and Soyland on one side and IP on the other, freezing the coops' required investments, reducing the coops' ownership interest, mutually releasing liability, and tolling the statute of limitations. In separate agreements, certain rights to IP fossil-fuel electric energy sources were extended to the coops.

In December 1985, an independent audit by Touche-Ross alleged cost overruns exceeding $400 million at the Clinton Nuclear Station, due to IP mismanagement. The WIPCO and Soyland board started investigations into a possible legal action based upon mismanagement overruns. Plaintiffs had made many complaints about the IP transaction. The present action by plaintiffs resulted from nominal defendants delaying their actions against IP.

We, by our summary of the history, do not intend to downplay the complexity of all the facts surrounding this cause of action. Plaintiffs seek, as part of their requested relief, a rescission of the original partnership agreement and the voiding of the 1983 and 1984 agreements, especially those concerning mutual release liability.

Nominal defendants, together with their underlying member cooperatives, are faced with decisions concerning power sources, power costs, and the economic effect of winning or losing litigation with IP. These business decisions are far from simple and, possibly, beyond the actual ability of either plaintiffs or the management and directors of WIPCO and Soyland.

■■ Legally, we begin by recognizing the principle that corporate decisions are the responsibility of the board of directors and not subject to various shareholders' control. This is referred to as the business judgment rule and extends to the management of matters of litigation. (*United Copper Securities Co. v. Amalgamated Copper Co.*

(1917), 244 U.S. 261, 263, 61 L. Ed. 1119, 1124, 37 S. Ct. 509, 510.) There generally is a presumption that in making a business decision, the directors act on informed basis, in good faith, and in the honest belief that the action taken is in the best interest of the company. *Aronson v. Lewis* (Del. 1984), 473 A.2d 805.

■ Derivative actions exist when directors or officers commit wrongful acts detrimental to the corporation, and the corporation fails to bring a related legal action. (13 W. Fletcher, Cyclopedia of the Law of Private Corporations §5941.1, at 18-22 (rev. ed. 1984).) These wrongful acts can include fraudulent conduct, breach of fiduciary duties, or the failure to bring a suit against a third party. The nature of a derivative suit is twofold. It is a suit to compel the corporation to sue, and a suit by the corporation, asserted by the shareholder on its behalf, against those liable to it. *Kaufman v. Kansas Gas & Electric Co.* (D. Kan. 1986), 634 F. Supp. 1573, 1577; *Aronson*, 473 A.2d at 811.

■ Generally, a corporation can, due to the business judgment rule, step in and dismiss a derivative suit as being contrary to the corporation's best interest. (See *Abramowitz v. Posner* (2d Cir. 1982), 672 F.2d 1025.) However, this ability is restricted if it appears that the corporate management and directors are not acting independently and in good faith. See *Abramowitz*, 672 F.2d 1025; *Zapata Corp. v. Maldonado* (Del. 1981), 430 A.2d 779.

In the present case, the complaint alleges, as a basis for its suit, that nominal defendants have failed to proceed with the suit against IP. There are no allegations of any other wrongdoing by the corporate authorities. After the nominal defendants asked to be realigned, plaintiffs asked permission to file an amended complaint which named various officers and directors as defendants and alleged they are personally liable to the corporations for their conduct. The court did not allow this amended information, and it is not now part of this action.

Thus, we are faced with the anomalous situation where plaintiffs have filed suit on behalf of the corporations against IP, alleging the management of the corporations refused to do so, but, now that the corporations wish to conduct the action on their own behalf, plaintiffs are resisting them.

Plaintiffs insist the court's decision was erroneous for several reasons. First, they believe the court should not have conducted the hearing on the good faith and independence of nominal defendants. Second, they maintain, if the hearing should have been conducted, the court mistakenly placed the burden of proof on them. Third, they allege that, if the first two steps were proper, then the court's ultimate decision was against the manifest weight of the evidence.

## PROPRIETY OF EVIDENTIARY HEARING

Plaintiffs assert the court should not have conducted a hearing. They rely on a string of Federal cases which hold that in questions of party realignment, the court must look at the pleadings and the nature of the dispute to determine if the corporation is actually antagonistic to the shareholders' claim. (See *Liddy v. Urbanek* (11th Cir. 1983), 707 F.2d 1222, 1224; *Lewis v. Odell* (2d Cir. 1974), 503 F.2d 445, 447.) We do not find these cases persuasive since they are directed to questions of party alignment for purposes of Federal diversity jurisdiction.

■ Rather, we believe the analysis most persuasive to our situation is in those cases where the court allows the corporation to dismiss the derivative complaint over the wishes of the plaintiff shareholders (see *Abramowitz*, 672 F.2d 1025; *Zapata*, 430 A.2d 779), since the authority to ultimately dispose of the lawsuit is what is involved in the present case. In those cases, the court acknowledged the efficacy of the business judgment rule and the importance of deferring to the corporate authorities in decisions involving corporate litigation. Accordingly, they determined a hearing should be held to determine the directors' good faith and independence in seeking termination of the suit. If that is established, then, due to the business judgment rule, the action would be dismissed.

Similarly, the Illinois courts recognize the strong preference to the decisions of the corporate boards:

> " 'The directors represent all the stockholders and are presumed to act honestly and according to their best judgment for the interests of all. Their judgment as to any matter lawfully confided to their discretion may not lightly be challenged by any stockholder or at his instance submitted for review to a court of equity. *** And a court of equity may not be called upon at the appeal of any single stockholder to compel the directors of the corporation to enforce every right which it may possess, irrespective of other considerations. It is not a trifling thing for a stockholder to attempt to coerce the directors of a corporation to an act which their judgment does not approve, or to substitute his judgment for theirs.' " (*Goldberg v. Ball* (1940), 305 Ill. App. 273, 282, 27 N.E.2d 575, 579, quoting *Corbus v. Alaska Treadwell Gold Mining Co.* (1903), 187 U.S. 455, 463, 47 L. Ed. 256, 259-60, 23 S. Ct. 157, 160.)

It would seem incongruous to recognize this important principle and then deny the corporate authorities the right to control a corporate cause of action based on the artful pleadings of the derivative com-

plaint. We believe that, due to this presumption, a corporation should be able to be realigned and take over responsibility for its own cause of action, subject to a hearing on the good faith and independence of the board in reaching this determination.

WIPCO and Soyland contend the realignment should have been automatic and without the trial court hearing. In light of the allegations of conflict, and WIPCO and Soyland's delay in seeking realignment, we disagree and approve the trial court's hearing requirement. In so deciding, we are cognizant of the conflict with the general policy letting corporate directors make all of the business decisions.

### BURDEN OF PROOF AT HEARING

Similarly, we find the court properly placed the burden on plaintiffs to prove the coops were not acting independently and in good faith in seeking to be realigned as plaintiffs. Plaintiffs insist this is incorrect, relying on *Zapata*, where the Delaware Supreme Court placed the burden on the corporate authorities.

However, a close reading of *Zapata*, which is further explained in *Abramowitz*, clarifies that the court was addressing two different situations. The first is where a demand to sue is not made on the corporation because it is deemed futile. This is generally due to improper conduct of members of the board of directors where the courts recognize it would be a useless task to ask the board to sue themselves. In this situation, if the board seeks to dismiss the action, the disinterested board members have the burden of proving their good faith. (*Abramowitz*, 672 F.2d at 1031.) This is not the situation with which we are faced.

The second circumstance involves those cases where a demand to sue a party has been made on the board and they have refused to do so. In that situation, since the refusal to sue was presumably made by application of the board's business judgment, the shareholder has the burden at the hearing on the motion to dismiss to prove some wrongdoing on the behalf of the board in reaching that determination. (*Abramowitz*, 672 F.2d at 1031.) This is the factual setting before us, and we find this analysis persuasive.

As noted, the business judgment rule is grounded on the thesis that the corporate directors are, in good faith, applying their best business judgment for the benefit of all. Accordingly, a decision to not sue or delay filing a suit should be given deference. There may exist a myriad of factors for the board making that determination. For example, in the present case, it is apparent the directors were attempting to balance concerns of costs and long-term power supply, as well as

investigating a possible claim against one of its suppliers. In such a situation, the directors' decision is presumed proper, and the burden is properly placed on the shareholder plaintiffs to show that the directors are not now acting in good faith and independently in desiring to prosecute the lawsuit. An opposite result would unduly burden corporation management and directors, who have the responsibility for the business decisions of the corporation, from taking control of what are, in fact, the corporation's legal proceedings.

### ATTORNEY-CLIENT PRIVILEGE ISSUE

Prior to determining the question of sufficiency of evidence, we consider the plaintiffs' argument that the trial court improperly found an attorney-client privilege existed, limiting certain discovery from the board of directors' minutes of both WIPCO and Soyland.

Plaintiffs were supplied with redacted copies of defendants' board meeting minutes. Plaintiffs attempted to elicit testimony concerning the redacted discussions between attorney John Ward and defendants' board. Defendants asserted the privilege, alleging they did not want the representatives of IP, present in the courtroom, to receive the information. The court upheld the privilege.

■ ■ The attorney-client privilege exists in order that one who is, or seeks to become, a client may consult freely with counsel, without fear of compelled disclosure of information communicated by him to the attorney whom he has employed, or seeks to employ. (*People v. Adam* (1972), 51 Ill. 2d 46, 48, 280 N.E.2d 205, 207, *cert. denied* (1972), 409 U.S. 948, 34 L. Ed. 2d 218, 93 S. Ct. 289.) The privilege is created and continues to exist where legal advice of any kind is sought from a professional legal advisor in his capacity as such, at which time the communications relating to that purpose, which are made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal advisor, except when the privilege is waived. (*Adam*, 51 Ill. 2d at 48, 280 N.E.2d at 207.) This privilege also applies to discussions between a legal advisor and the control group of a corporation. (*Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 118, 432 N.E.2d 250, 257.) In the present case, it is evident defendants are such a control group and, absent any exceptions, the general rule should apply.

■ John Ward testified he is an attorney, licensed and practicing in Iowa. He is not licensed in Illinois State courts, but is licensed in the Federal courts. Since 1983, he has provided services to Soyland. In response to questioning about the redacted portion of the March 1984 minutes, defendants asserted their privilege. The court reviewed

an unredacted copy of the minutes and, finding that legal advice was involved, upheld defendants' assertion.

Plaintiffs observe that Ward admits he is not licensed to practice in Illinois. They argue the purpose of the privilege is to protect the attorney-client relationship. Since Ward cannot be considered an attorney in Illinois, then there is no relationship to protect.

It is clear Ward is not licensed in Illinois. However, this appears to have little to do with the efficacy and application of the privilege. The purpose of the privilege is to facilitate a dialogue between a legal advisor and a client to allow for advice and an exchange of information without fear of this discussion being subject to compelled disclosure. The key appears to be not whether an attorney is licensed in Illinois, but whether a protected relationship has developed between a professional legal advisor and a client.

The above analyses seem particularly appropriate in view of the fact the practice of law is becoming increasingly specialized and technical. It is, therefore, necessary for corporate boards to seek out counsel from those attorneys having developed the requisite expertise. To hold that the communications between these parties has somehow lost its privileged character because counsel is not licensed in the present jurisdiction makes little sense. In fact, in the Federal courts, the privilege is available as long as counsel is "a member of the bar of a court" (emphasis added) (*United States v. United Shoe Machinery Corp.* (D. Mass. 1950), 89 F. Supp. 357, 358), and has been applied even though counsel was not licensed in the respective jurisdiction. See *Paper Converting Machine Co. v. FMC Corp.* (E.D. Wis. 1963), 215 F. Supp. 249; *Georgia-Pacific Plywood Co. v. United States Plywood Corp.* (S.D.N.Y. 1956), 18 F.R.D. 463; *Zenith Radio Corp. v. Radio Corp. of America* (D. Del. 1954), 121 F. Supp. 792.

■ Plaintiffs next contend that this court should adopt a good-cause exception to the privilege in shareholder derivative lawsuits. They rely on the case of *Garner v. Wolfinbarger* (5th Cir. 1970), 430 F.2d 1093, *cert. denied* (1971), 401 U.S. 974, 28 L. Ed. 2d 323, 91 S. Ct. 1191.

The *Garner* opinion might seem applicable to the present case and the hearing held by the trial court. However, the present action is not against the officers and directors, as in *Garner*, and this would, normally, justify a decision contrary to *Garner*. In the trial court hearing, the issue related to the good-faith conduct of the directors in pursuing the action against IP. The litigated relationship appears similar to the facts in *Garner*, with an important exception—the disclosure of information sought could have a detrimental effect on the co-

operatives in their litigation with IP. IP was present by counsel and is the principal party defendant in the derivative action.

We conclude the trial court acted properly in holding the attorney-client relationship existed. Further, we have gone further than the trial court and have examined the sealed documents containing the unredacted minutes, and conclude no information of value exists relating to determining the issue of good faith.

### PROPRIETY OF TRIAL COURT'S DETERMINATION

■■■ We have considered the evidence before the trial court. The record indicates the substantial problems which confronted both WIPCO and Soyland in obtaining power sources. In the 1980's Soyland cancelled construction that had already begun on a coal generation plant located in Pike County. Availability of government financing became questionable when a $900 million projected cost was determined. Negotiations for long-term power sources, in addition to the Clinton Nuclear Station, were sought from several sources. Separate contracts with IP, relating to energy from fossil-fuel plants, were delayed because of hearings before the Federal Energy Regulatory Commission. Negotiations for long-term contracts with Central Illinois Public Service Company appeared to be proceeding over a lengthy period of time and causing great concern.

During all this time, the escalating costs of the Clinton Nuclear Station, together with the settlement of claims because of cancellation or delay of the Pike County construction, placed both WIPCO and Soyland on the verge of bankruptcy. Congressional action was eventually needed and obtained to enable satisfactory refunding of debt payments to the United States government.

Negotiations with IP resulted in a limit on the investment in the Clinton Nuclear Station. The coop minutes over the several-year period indicated the great concern over power costs. Board members changed, as did management personnel. Opinions of board members in how to proceed differed. In May 1986, a separate legal committee was set up to evaluate the advisability of proceeding in the derivative action. Concern was voiced by this committee relating to the possibility of loss of all power benefits from IP. In December 1986, a consulting firm was retained to advise WIPCO and Soyland as to advisability of seeking action against IP relating to the Clinton Nuclear Station construction mismanagement.

We are mindful of the various transactions between WIPCO and Soyland on one hand and IP on the other, but we conclude the trial court's decision allowing the cooperatives to be realigned as plaintiffs

and dismissing the initial plaintiffs was not against the manifest weight of the evidence.

The substantial record in this case further indicates the complexities which exist. It is obvious that consideration must be given to interests other than just recovering a portion of an unnecessary $400 million overrun or a billion dollar overrun. The long-term source of power must be considered with the present and future projected costs of electrical energy from both the Clinton nuclear source and fossil-fuel sources. Decisions concerning these matters are those of the board of directors.

Because of our decision, we find issues relating to preliminary injunctions to be moot.

Affirmed.

McCULLOUGH, P.J., and KNECHT, J., concur.