Sanders, Janet L., J.
This is a derivative action brought on behalf of two Delaware business trusts, the Ridgewood Electric Power Trust v. and Ridgewood Power Growth Trust (collectively, the “Trusts”). The defendants are: the Trusts’ managing shareholder, Ridgewood Renewable Power, LLC (“RRP”); RRP’s manager Robert Swanson; and Ridgewood Energy Holding Corporation (“Ridgewood”), Trustee of the Trusts. The plaintiffs, all minority shareholders in the Trusts, allege that RRP and the other defendants engaged in self dealing in breach of their fiduciary duty through a set of transactions involving the Trusts’ most valuable asset, a renewable energy company known as Envirogas. Trial in this four-year-old case is scheduled for November 29, 2011.
The issue before the Court is whether to dismiss this action based on the report of what is purportedly a “Special Litigation Committee” formed by the defendant RRP. That report concludes that the plaintiffs are not likely to succeed on the merits of their claims and that further prosecution of this action is not in the best interest of the Trusts. Relying on Zapata Corp. v. Maldonado, 430 A.2d 779 (Del. 1981) (“Zapata"), the defendants argue that dismissal is warranted if this Court concludes that the Committee was independent, acted in good faith and conducted a thorough investigation with reasonable bases for its conclusions. In opposition, the plaintiffs argue that the Committee has no authority to act on behalf of the Trusts so that the Motion to Dismiss (purportedly brought by the Trusts themselves) should be stricken in its entirety. This Court agrees with the plaintiffs that the Committee has no standing to speak for the Trusts and that the Motion to Strike the Motion to Dismiss should be Allowed, for reasons set forth below.
BACKGROUND
This Court only briefly summarizes the plaintiffs’ allegations. The Trusts were created in the 1990s as an investment vehicle for renewable energy projects. In 2000, the government for the United Kingdom began considering legislation that created lucrative subsidies for such projects. In late 2001 when it became clear this legislation would be enacted, RRP on behalf of the Trusts acquired a majority ownership stake in Envirogas, which had a portfolio of methane gas projects ready to be developed. Rather than undertaking a course of action which would maximize Envirogas’s value for the Trusts, the defendants instead orchestrated a series of complex transactions which had the net effect of transferring a substantial portion of Envirogas’s value to “PowerBanks” set up by the defendant Swanson and RRP. When Envirogas was sold in 2007 for $230 million, PowerBanks walked away with 69 percent of the proceeds, whereas the Trusts, which owned 88 percent of Envirogas, received a 31 percent share. The big winner was RRP, which (according to the plaintiffs) reaped $40 million more than it should have.
This lawsuit was commenced on March 20, 2007. After several procedural skirmishes and an unsuccessful mediation, RRP went about appointing what it described as a Special Litigation Committee pursuant to Zapata, supra. This so-called “SLC” consisted of two members, Grover Brown, a former Delaware Chancery Court judge, and Robert P. Wax, former vice president and general counsel of Northeast Utilities, Inc. Simultaneously, Brown and Wax were appointed as “Special Litigation Managers” on the Board of RRP. The defendant Swanson, holding a majority of RRP’s voting units, had the power to remove Brown and Wax from their positions at any time. Under their engagement letters with RRP, Brown was to receive $700 an hour for his time, and Wax $600 an hour, with a $30,000 *142 advance. Collectively, they have been paid a total of $400,000 by RRP. The result of their work is a 197-page report outlining their investigation of plaintiffs’ allegations and the reasons why they conclude that the continuation of this lawsuit is not in the best interest of the Trusts. Wax and Brown, purporting to act on behalf of the Trusts, brought the instant Motion to Dismiss.
DISCUSSION
The starting point for this Court’s analysis as to Wax’s and Brown’s authority to act for the Trusts is the 1981 Zapata decision. In that case, a stockholder brought a derivative action on behalf of the corporation against ten officers and directors alleging various breaches of fiduciaiy duty. Four years after the action began, the defendant directors were no longer on the board and the remaining directors appointed two new outside directors for the corporation. The board then created a committee composed of these two new directors to investigate the plaintiffs allegations. The committee concluded that the continued maintenance of the action was not in the corporation’s best interest and moved to dismiss the derivative action or in the alternative for sum-maiy judgment. The Delaware Court of Chanceiy denied the motion, holding that under Delaware law, the Committee did not have the authority to seek dismissal of an action that a stockholder has an individual right to maintain. On appeal, the Delaware Supreme Court reversed. In doing so, it outlined the circumstances under which such a committee can speak for the corporation and seek termination of a lawsuit ostensibly brought on the corporation’s behalf.
Acknowledging the right of an individual stockholder to initiate a derivative action, the Court stated that the right to continue it is not absolute. Certainly, a board tainted by the very illegality alleged by the shareholder plaintiff cannot be expected to institute a lawsuit challenging actions of its own directors. On the other hand, it should not be held hostage to a single individual or group if, as the lawsuit unfolds, it becomes clear that the action is not in the best interests of the corporation itself. The question for the Delaware Supreme Court, then, was how to strike the proper balance:
If, on the one hand, corporations can consistently wrest bona fide derivative actions away from well-meaning derivative plaintiffs through the use of the committee mechanism, the derivative suit will lose much if not all of its generally recognized effectiveness as an intra-corporate means of policing boards of directors. If, on the other hand, corporations are unable to rid themselves of meritless or harmful litigation and strike suits, the derivative action, created to benefit the corporation, will produce the opposite, unintended result.
Zapata, 430 A.2d at 786-87. The case before the Court in Zapata created an opportunity to resolve this dilemma by recognizing the power of a truly disinterested committee (or “SLC’j to seek termination of litigation, subject to appropriate judicial review.
Critical to the Court’s decision was the fact that Delaware statutoiy law permitted a corporate board tainted by the self interest of a majority of its members to legally delegate its authority to a committee of disinterested directors'. 8 Del.C. §§141(c) and 144. The Court held that, if the committee was properly constituted and was conferred with the authority to act on behalf of the board of the corporation on whose behalf the derivative action was brought, then it could, after appropriate investigation, move to dismiss the action, in the same way a plaintiff may seek voluntary dismissal of a lawsuit under Rule 41(a)(2). As a further protection to the plaintiff shareholder who initiated the derivative action, a court presented with such a motion must be convinced that the committee was truly independent, acted in good faith and had a reasonable basis for its conclusions. Finally, a court must exercise its own “business judgment” to determine whether the motion should be granted. Zapata, 430 A.2d at 788-89.
Since the Zapata decision, Delaware courts have applied its reasoning to factual situations that have not necessarily been on all fours with it but where the SLC members are determined to have no personal stake in the disputed transactions or any relationship with the defendant directors which would call into question their objectivity. Thus, for example, where all the directors of a corporate board are tainted but they have the power to appoint new directors, they may do so in order to put together a Special Litigation Committee consisting of those new members so long as they are sufficiently disinterested to be independent. See e.g. Sutherland v. Sutherland, 958 A.2d 235 (Del.Ch. 2008). That the new members were appointed by the tainted ones does not disqualify them, since their fiduciaiy duty is to the corporation. The Zapata “special committee” doctrine has even been extended in one case to a limited partnership, although the chancery judge who did so acknowledged that such an extension was not without difficulty. See Katell v. Morgan Stanley Group Inc., No. 12343, 1993 Del.Ch LEXIS 92 *8 (Del.Ch. June 8, 1993).[2] The common thread in each of these cases, however, is that the SLC was comprised of directors of the corporation (or their equivalent in the non-corporate setting) on whose behalf the derivative suit was begun. SLC members were not hired by nor did they work for the individuals (or entities) accused of wrongdoing. That is significant: their fiduciaiy duty was to the corporation of which they are a part, thus providing further assurance that they would operate only in its interest and not to protect those tainted by the alleged misconduct.
*143 Applying these principles to the instant case, this Court concludes that Brown and Wax are not an SLC as defined in Zapata and its progeny. As their engagement letters reflect, they were hired and paid by RRP, not the Trusts, with defendant Swanson signing a personal guarantee of payment. RRP agreed to indemnify both men and to provide them with D&O insurance. It also paid Brown’s and Wax’s expenses, including the cost of counsel (who argued the instant motion on their behalf), and the cost of experts and administrative assistance. Indeed, Brown and Wax have received $400,000 from RRP coffers to come up with the report that recommends dismissal of a case that accuses RRP of wrongdoing.
In addition to being financially beholden to RRP, Brown and Wax are also legally obligated to RRP. Although RRP could have appointed another managing shareholder to the Trusts and then designated that individual as the SLC (so that the individual worked for the Trusts and not RRP), RRP chose not to do that. Instead, Brown and Wax were made members of RRP’s board, with the corresponding fiduciary duty to RRP which that position carries with it: they hold no position in the Trusts themselves. Although RRP’s Operating Agreement was amended to redefine their fiduciary duty — stating that any duty that Brown and Wax had to RRP would be satisfied if they exercised the same fiduciary duty with respect to the Trusts — this amendment is hardly a cure to the problem. Holding the majority of voting units in RRP, Swanson could eliminate the amendment at any time, just as he has the power to discharge Brown and Wax whenever he chooses. Moreover, the amendment cannot eliminate the fiduciary obligation that exists apart from the RRP Operating Agreement and that both men still have to RRP. They are thus placed in a position of serving conflicting interests simultaneously.
There is an additional reason for challenging Brown’s and Wax’s authority to act on behalf of the Trusts, which is that RRP did not have power to appoint them to act as an SLC for the Trusts in the first place. Critical to the Court’s decision in Zapata was that the board of directors of the corporation on whose behalf the derivative action was brought was empowered under a Delaware statute, 8 Del.C. §141, to appoint a committee and to delegate to it certain managerial decisions. Zapata, 430 A.2d at 785; see also Aronson v. Lewis, 473 A.2d 805, 813 (1984). Delaware law does not confer the same powers to those in charge of a limited partnership or of a business trust, however. Instead, the specific rights and responsibilities of the parties in such arrangements are determined by the partnership agreements or Trust documents themselves. Here, RRP’s power to set up an SLC on behalf of the Trusts depends on what rights were conferred upon it in each Trust’s Declarations. Those Declarations— which are virtually identical to each other — allow the Trusts’ Managing Shareholder (RRP) to lend money to theTrusts, approve transfer ofshares orwithdrawthe offering ofshares, and appoint certain officers. See Art. 12 of Declarations. Nowhere do the Declarations authorize the appointment of an SLC or any other committee conferred with managerial authority. Indeed, the Declarations allow the Trusts’ Managing Shareholder to appoint another managing shareholder only if it first obtains the approval of the Trusts’investors. See Art. 12.3(a)(4) of Declarations. RRP did not obtain approval from the Trusts’ investors for Brown’s and Wax’s appointments.
The defendants respond by citing another provision in the Declarations which generally confers on the Trusts all the powers of a corporation under Delaware law. Art. 1.8 of Declarations. This general provision says nothing about the Managing Shareholder’s powers, however, and does not override the more specific description of RRP’s rights and responsibilities — with the corresponding limitation on those rights — as set forth in Art. 12. See Brinckerhoff v. Texas E. Prods. Pipeline Co., LLC, 986 A.2d 370, 378 (Del. 2010) (more specific provision prevails over more general one). The defendants also argue that this entire line of inquiry as to RRP’s authority to name an SLC is beside the point since Brown and Wax comprise a committee not of the Trusts but of RRP. See Defendant’s Reply to Plaintiffs’ Cross Motion to Dismiss, p. 12, fn. 7. But then that is precisely why this Court is persuaded that this is not an SLC at all. Brown and Wax are not acting on behalf of the Trusts here, but are agents for one of the defendants. They are clearly not in a position to seek dismissal of this action on behalf of the Trusts as plaintiffs.
CONCLUSION AND ORDER
For all foregoing reasons and for other reasons set forth in the plaintiffs’ Memoranda of Law, this Court concludes that the purported Special Litigation Committee which brings the Motion to Dismiss now before the Court is both unprecedented and unauthorized. The plaintiffs’ Motion to Strike the Motion to Dismiss asserted by the two members of that Committee is therefore ALLOWED and it is ORDERED that the Motion to Dismiss be STRICKEN.

Although the parties discuss Katell extensively in their submissions, it is important to note that all of the Katell decisions (there being three of them) are unpublished opinions by a lower court judge and therefore have no precedential value.