**Mary STEIN, Plaintiff,**

v.

**Hosea W. BAILEY, W. O. Baker, R. J. Cantwell, James E. Cunningham, Charles L. Graves, Robert K. Richie, Walter B. Shaw, George G. Zipf, McDermott Incorporated, Smith Barney, Harris Upham & Co., Incorporated, and Morgan Stanley & Co., Incorporated, Defendants.**

No. 78 Civ. 2364 (JMC).

United States District Court,
S. D. New York.

Feb. 4, 1982.

Levy & Levy, New York City (Morris J. Levy, New York City, of counsel), for plaintiff.

Davis, Polk & Wardwell, New York City (Richard E. Nolan, Joel B. Gardner and Elizabeth Bradford, New York City, of counsel), for defendants Bailey, Baker, Cantwell, Cunningham, Graves, Richie, Shaw, Zipf and J. Ray McDermott & Co., Inc.

White & Case, New York City for defendant Smith Barney, Harris Upham & Co. Inc.

Cravath, Swaine & Moore, New York City (Paul M. Dodyk and Richard W. Clary, New York City, of counsel), for defendant Morgan Stanley & Co., Inc.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Defendants' motion for summary judgment is granted. Fed.R.Civ.P. 56.

1. McDermott is incorrectly named in the third amended complaint as "McDermott Incorporated."

2. The allegations of the second amended complaint, which are substantially restated in the third amended complaint, are set forth as follows in *Stein I*:

> *First*, plaintiff alleges that between 1962 and the present time the defendants who are or were then members of the McDermott board of directors, acting in concert with the defendant officers and employees of McDermott, caused illegal payments to be made by the company. This information was not included in various unspecified reports and proxy statements which were filed over the years pursuant to section 14(a) of the [Securities Exchange Act of 1934]. In particular, plaintiff contends that the board of directors should have disclosed this information in proxy statements issued in 1968 and 1974 which sought and received shareholder approval of two career executive stock plans. Plaintiff contends that as a result of this omission, the proxy statements were materi-

Motion by defendant Morgan Stanley & Co., Incorporated, to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), is dismissed as moot.

### FACTS

The facts of this case relevant to the instant motion are essentially undisputed. On July 18, 1980, this Court dismissed plaintiff's second amended complaint because (1) plaintiff had failed to state a claim for relief under the federal securities laws with respect to defendant J. Ray McDermott & Co., Incorporated's ["McDermott"] [1] acquisition of the Babcock & Wilcox Company ["B&W"]; and (2) plaintiff had not satisfied Fed.R.Civ.P. 23.1's requirement that a shareholder first make a demand upon the board of directors to enforce the corporation's rights before commencing a derivative action. Because plaintiff had also failed to demonstrate that such a demand would have been futile, the Court found that the demand requirement was not excused and granted plaintiff leave to replead after the required demand had been made. *See Stein v. Aldrich*, Memorandum and Order, 78 Civ. 2364 (JMC) (S.D.N.Y. July 18, 1980) ["*Stein I*"].[2]

> ally false and misleading since the shareholders were "denied essential information regarding the integrity of its management and employees which constitutes a material element for their decision as to whether or not the employees of McDermott and its subsidiaries should be rewarded by the shareholders' approval of the 1968 [and 1974] Plan[s]." Second Amended Complaint, ¶¶ 22, 29. Since the plans were allegedly obtained by means of false and misleading proxy statements in violation of sections 10(b) and 14(a), plaintiff seeks to have the plans declared null and void, all shares issued thereunder surrendered to McDermott, and damages assessed.
>
> *Second*, the complaint challenges McDermott's competition with United Technologies Corporation ["United"] for control of Babcock, and McDermott's eventual merger with Babcock on March 31, 1978. Plaintiff alleges that during the transactions in question, McDermott was advised by the investment banking firm of Smith Barney .... Morgan Stanley advised Babcock throughout these transactions.

On August 18, 1980, plaintiff, by her attorneys, made an appropriate demand on McDermott's Board of Directors, asking that the Board sue on the claims contained in the second amended complaint.[3] In response, on September 25, 1980, in New Orleans, the Board established an "Independent Committee on Litigation" [the "Committee"], pursuant to the following resolution:

> Plaintiff contends that after Babcock's directors refused United's proposal to purchase the outstanding shares of Babcock at $42 per share on April 4, 1977, McDermott's directors caused the company to purchase 1,205,600 of Babcock's common shares on the open market at prices between $39.75 and $45.125 per share. Thereafter, when United raised its offer to $48 per share, McDermott's directors made a proposal to purchase 4,300,000 shares of Babcock common stock for $55 per share. Babcock's directors, on the advice of Morgan Stanley, agreed to recommend that price. However, plaintiff alleges that McDermott's formal tender offer of August 25, 1977, made on the advice of Smith Barney, provided for the purchace of 4,800,000 shares of common stock at a price of $62.50 per share, owing chiefly to competition from United. The tender offer gave McDermott a 49% interest in Babcock. Plaintiff claims that the above acquisition of Babcock's common stock defrauded McDermott and its shareholders.
>
> *Id.* at 3–6 (footnotes omitted).

**3.** *See* Affidavit of John B. Tweedy, Exhibit A (Appendix, Exhibit B) (filed July 13, 1981) ["Tweedy Affidavit"]. The demand letter states, in pertinent part:

> On behalf of our client we hereby request that McDermott institute suit against certain of its present and former officers, employees and directors and certain of the present and former officers and employees of its subdiaries [sic] who received grants of McDermott shares of common stock pursuant to its 1968 and/or 1974 Career Executive Stock Plans (the "Plans") to have the Court declare the Plans null and void and require the recipients of the grants to surrender the shares which they received thereunder to McDermott and award it any damages resulting therefrom. The factual basis for such request is as follows:
>
> Between 1962 and 1978 McDermott was caused to make certain secret, unauthorized and illegal payments of more than $1,950,000 to secure domestic and foreign business and special political favors.
>
> On or about June 11, 1968 the Board of Directors of McDermott passed a Resolution which was submitted to and approved by its shareholders at the annual meeting held on

RESOLVED, That pursuant to Article II, Section 5 of the By-Laws of the Corporation, there is hereby established an Independent Committee on Litigation which shall consist of the following members of the Board: Messrs. Tweedy, Seawell and Wagner, each of whom has orally confirmed that he has not been in any way connected or involved with the mat-

> August 13, 1968 adopting the 1968 Career Executive Stock Plan. On June 11, 1974 the Board of Directors of McDermott passed another Resolution which was submitted to and approved by its shareholders at the annual meeting held on August 13, 1974 adopting the 1974 Career Executive Stock Plan.
>
> In connection with the aforementioned annual shareholders meeting seeking approval of the respective Career Executive Stock Plans the Boards of Directors of McDermott solicited proxies from the shareholders by means of Proxy Statements which were false and misleading in that they failed to disclose any information concerning the improper and illegal payments made by McDermott and its subsidiaries.
>
> By reason of such facts the approvals by the shareholders of the Plans were not proper in that they were obtained in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Act"), thus vitiating the legality of the Plans. Despite the illegality of the Plans the Boards of Directors of McDermott put them into effect thereby causing that corporation to sustain damages thereby [sic].
>
> On behalf of our client we further request that McDermott institute suit against certain of its [sic] present and former members of its Board of Directors and against Smith Barney Harris Upham & Co., Incorporated and against Morgan Stanley & Co., Incorporated to recover the damages sustained by McDermott by reason of the tender offer made for the shares of The Babcock & Wilcox Company ("BW") and the subsequent merger of BW with a subsidiary of McDermott. The basis for such action is predicated upon the fact that the price which McDermott was caused to pay for the shares of BW was exhorbitant and beyond its reasonable fair market value and greatly exceeded the price which control stock would command. Moreover, McDermott did not have the cash to purchase the BW shares and was, therefore, compelled to borrow huge sums at high interest rates for that purpose. Furthermore, the proxy material soliciting the approval of the McDermott shareholders for the merger between its subsidiary and BW allegedly contained false and material statements in violation of § 10b of the Securities Exchange Act of 1934.

ters referred to in the demand made on behalf of, and the claims made by, Mary Stein, and is not aware of any reason that might disqualify him from serving on the Committee; ... and that the Committee shall

1) conduct or cause to be conducted, review, analysis and investigation of the circumstances surronding [*sic*] all matters referred to in the letter dated August 18, 1980 from Morris J. Levy, Attorney for Mary Stein, and the demand set forth therein,

2) make the determination as to whether the Company should comply with such demand or any part thereof, and

3) undertake and supervise any action by the Corporation necessary or appropriate to implement any such determination.[4]

The Committee was composed of three outside directors—John B. Tweedy, an Executive Vice President and director of Tosco Corporation; William T. Seawell, the Chairman of the Board and Chief Executive Officer of Pan American World Airways; and Russell L. Wagner, the Chairman of the Board and Chief Executive Officer of NLT Corporation—all of whom attended the September 25, 1980 Board meeting.[5] The three Committee members became members of McDermott's Board on March 27, 1978, June 13, 1978, and September 24, 1979, respectively. None had any prior affiliation with McDermott, and their only affiliation with McDermott has been as directors. Thus, none of the three had any involvement with McDermott during the relevant time period and none has received or is eligible to receive stock under the 1968 and 1974 executive career stock plans that are in part the subject of this litigation.[6] The Committee immediately conducted an organizational meeting, electing Tweedy as

its chairman, and scheduled its next meeting for October 8, 1980, in New York.

On October 1, 1980, the New York law firm of Cleary, Gottlieb, Steen & Hamilton ["Cleary, Gottlieb"], which never before had acted as counsel to McDermott or any of its Board members, was retained by Tweedy as special counsel to the Committee. Tweedy authorized Cleary, Gottlieb to (1) advise the Committee on the appropriate manner in which it should proceed; (2) conduct legal research and prepare memoranda for the Committee on the merits of the claims stated in plaintiff's demand letter; (3) assist the Committee in fact-finding, especially with respect to (i) the accuracy and completeness of the April 12, 1977, Report of the Audit Committee of McDermott [the "Audit Committee Report"],[7] which reported the results of the Audit Committee's investigation into certain illegal payments made by McDermott and not disclosed to the shareholders in the proxy solicitations relating to the 1968 and 1974 stock plans, (ii) the appropriateness of imposing the sanctions sought by the demand letter in addition to the sanctions already imposed by the Board following the Audit Committee Report, (iii) the consequences to McDermott of maintaining suit on the claims raised in the demand letter, and (iv) the adequacy of the Board's judgment and decisions in connection with the B&W acquisition; (4) arrange, with respect to the aforementioned fact-finding, for the Committee to interview relevant witnesses and obtain and analyze pertinent documentary evidence; and (5) prepare a report to embody the conclusions reached by the Committee.

Between September 25 and October 8, each Committee member reviewed the Audit Committee Report, minutes of meetings of the Audit Committee and the McDermott Board relating to that report, plaintiff's demand letter, the second amended com-

**4.** Tweedy Affidavit, Exhibit A (Appendix, Exhibit A).

**5.** Although plaintiff contends in her brief that the four defendant directors of McDermott were also present at the September 25th meeting, *see* Memorandum in Opposition at 11 (filed

Nov. 25, 1981), she has not substantiated this claim by affidavit or otherwise.

**6.** *See* notes 2–3 *supra.*

**7.** Tweedy Affidavit, Exhibit A (Appendix, Exhibit C).

plaint, the motion papers relating to defendants' motions to dismiss the second amended complaint, and the Court's decision in *Stein I.* The Committee met on October 8, with special counsel present, and interviewed Bartlett H. McGuire, a member of the law firm of Davis Polk & Wardwell, which served as special counsel to the Audit Committee, and John A. Morgan, the chairman of the Audit Committee.

McGuire described in detail the methods, scope and substance of the Audit Committee's investigation, which was begun in August 1976. Approximately two months earlier, McDermott had disclosed in its Annual Report that its management had participated in making certain "questionable payments" in its domestic and foreign operations. Soon thereafter, the full Board ratified the Audit Committee's decision to investigate, and on April 12, 1977, the Audit Committee issued its final report. The Audit Committee retained Arthur Young & Company to act as special auditors and to make an independent search of McDermott's financial records. More than one hundred interviews were conducted throughout the world, and Arthur Young and McDermott employees expended approximately 80,000 man-hours assisting in the investigation. The Audit Committee Report describes the extent of the questionable payments and identifies several then present or former directors and executives who participated therein, including four defendants in the instant action, Bailey, Cunningham, Graves and Richie.

Also at the October 8 meeting, Morgan, the Audit Committee chairman, discussed and explained the various recommendations and sanctions suggested by the Audit Committee in its report. The Audit Committee's recommendations included: (1) restructuring the Board so that it would have a majority of nonmanagement directors; (2) reorganizing the company's internal audit staff; (3) creating an in-house legal staff; (4) replacing the company's outside accountant with a major international accounting firm; and (5) restating the company's policy on improper payments. The Audit Committee also recommended that the Board sanction the four executives most directly involved, Bailey, Cunningham, Graves and Richie, by reducing their compensation in the fiscal year ending March 31, 1977, in an aggregate amount of approximately $300,000. All the above recommendations were adopted by the full Board. The Audit Committee considered and rejected other sanctions, including rescinding the stock awards made under the Company's stock plans.

In addition, at the October 8, 1980 meeting, special counsel advised the Committee that it should assess both the legal and business ramifications of taking the steps requested in plaintiff's demand letter. Following that, each Committee member described his own relationship with McDermott and affirmed that he had not been involved in any of the occurrences to which the demand letter alluded. The Committee members then expressed tentative views that the claims relating to the stock plans should not be pursued. Finally, the Committee requested Cleary, Gottlieb to prepare and distribute a legal assessment of plaintiff's claims by October 15, and scheduled the next meeting for November 3, 1980, in New York.

A preliminary draft of Cleary, Gottlieb's memorandum, limited to an analysis of the stock plan claims, was distributed to the Committee members on October 15, and a final draft was made available at the November 3 meeting.[8] At that meeting, the Committee discussed the preliminary draft with special counsel, focusing on whether the admitted failure to disclose the questionable payments in the 1968 and 1974 proxy solicitations was material, an essential element of plaintiff's securities law claims. Special counsel had discovered the existence of several lawsuits containing nearly identical claims, each of which had been dismissed for lack of materiality. In addition, special counsel pointed out that in August 1980 McDermott's shareholders had

8. *Id.* (Appendix, Exhibit I).

approved a new executive compensation plan, including stock awards, with full knowledge of both the earlier illegal payments and the fact that several executives who participated in the illegal payments, and who were defendants in the then-pending instant suit, would be eligible for stock awards under the new plan. Special counsel, therefore, offered its opinion that the stock plan claims would fail for lack of materiality.

In the preliminary draft, special counsel also opined that even if the stock plan claims could be proven, a court would not order the remedy plaintiff demanded—namely, cancellation and surrender of all stock issued under the 1968 and 1974 plans—because although approximately 110 executives received stock under the plans, only six were involved in the illegal payments. Thus, to penalize all 110 would, in counsel's opinion, be inequitable and in contravention of the relevant statute.[9]

In addition, at the November 3 meeting, Edwin B. Mishkin, on behalf of Cleary, Gottlieb, explained the legal standards that would govern the B&W acquisition claim. Mishkin noted that this Court had already ruled that the acquisition claim did not state a claim for relief under the federal securities laws, as framed in the second amended complaint. He also advised the Committee that if this claim were viewed instead as a claim for breach of the duty of care imposed by state law, the directors would likely be found not liable because their decisions would be found to have been reached in the good faith exercise of their reasonable business judgment.[10]

During the November 3 meeting, the Committee interviewed John A. Lynott, a director and officer of McDermott, who was its Treasurer at the time of the B&W acquisition, by telephone, concerning the circumstances of the acquisition and subsequent merger. The Committee focused its questions on the purposes of the merger, the role of the Board and other participants in the tender offer decision-making, other courses of conduct available to the company, and the expected and actual operating results following the acquisition.

Following its interview of Lynott, the Committee tentatively concluded that it would (1) reject plaintiff's challenge to the B&W acquisition, and (2) adopt the legal conclusions made in special counsel's preliminary draft relating to the stock plan claims, subject to further review. The Committee directed Cleary, Gottlieb to prepare a draft final report to be delivered to each member prior to the Committee's next meeting on November 10 in New Orleans.

The Committee met as planned on November 10 and reviewed the proposed "Report and Determination of the Independent Committee on Litigation" ["Report"].[11] After discussion, the Report and the following resolution were adopted unanimously:

> RESOLVED, That based upon its review, analysis and investigation of the circumstances surrounding all matters referred to in the letter dated August 18, 1980 from Morris J. Levy, Attorney for Mary Stein, and the demand set forth therein, the Independent Committee on Litigation has determined that it would be contrary to the interests of McDermott and its shareholders for the company, or anyone on its behalf, to institute, re-institute or maintain a legal action in connection with any of the matters set forth in that letter.[12]

---

9. Special counsel also advised the Committee that to pursue litigation on the stock plan claims would entail considerable expense because (1) it would involve suing more than 100 employees, (2) if the suit was successful, the company would be obliged to compensate the employees adversely affected, and (3) if the suit was unsuccessful, the six employees involved in the illegal payments would be entitled to indemnification from the company for their expenses in defending the suit.

10. Special counsel's advice was a reference to the "business judgment" rule. *See Galef v. Alexander*, 615 F.2d 51, 57 (2d Cir. 1980). *See* discussion at pp. 690–691 *infra*.

11. Tweedy Affidavit, Exhibit A.

12. *Id.* at 43.

By affidavit, each member of the Committee has sworn that he participated fully in the Committee's investigation and that he believes it is not in McDermott's best interest to pursue the claims raised in plaintiff's demand letter.[13] More specifically, each member has fully subscribed to the conclusions stated in the Report and the factors upon which they are based, namely: (1) with respect to the stock plan claims, (i) special counsel's opinion that the claims are without legal merit, (ii) the costs of litigation in terms of adverse effects on employee morale, disruption of management, loss of business and renewal of negative publicity, (iii) the sufficiency of the sanctions previously imposed by the Board against the executives most directly involved with the improper payments, and (iv) the implementation of changes in McDermott's management following the Audit Committee's investigation, which were specifically designed to prevent the recurrence of misconduct and which appear to have succeeded; and (2) with respect to the B&W acquisition claim, (i) the Committee's belief that McDermott's management and Board acted prudently and diligently in acquiring B&W's stock and arranging the merger of the two companies, (ii) special counsel's opinion that the "business judgment" rule protects McDermott's officers and directors from liability arising out of decisions made in connection with the acquisition,[14] (iii) the Committee's belief that, because of intense competition from another bidder, the tender offer would not have succeeded had McDermott paid less than its final offer, and (iv) the fact that McDermott has benefitted from its acquisition of B&W, even beyond the Board's expectations, because B&W's performance has outstripped the forecasts of analysts retained by both McDermott and B&W.

On November 19, 1980, the Board notified plaintiff of the Committee's determination. Plaintiff thereafter filed her third amended complaint, essentially restating the claims contained in the August 18 demand letter. The third amended complaint includes an allegation of a demand upon the Board and the Board's response, although that response is not characterized as wrongful or otherwise improper. The third amended complaint also omits any claim that the acquisition of B&W violated the federal securities laws. Instead, plaintiff repeats the factual allegations of the second amended complaint relating to the acquisition claim and alleges a common law breach of fiduciary duty.

## DISCUSSION

In *Stein I*, the Court examined the first of the two principal limitations upon a shareholder's right to bring a derivative action, the demand requirement embodied in Fed.R.Civ.P. 23.1. Because plaintiff has now complied with the demand requirement, defendants ask the Court to consider the second limitation—namely, the common law doctrine that a shareholder should in some instances be barred from suing on behalf of his corporation when the corporation's directors oppose that suit. This doctrine has often been considered one aspect of the "business judgment" rule, which

---

**13.** Moreover, Mishkin has stated in an affidavit:

> The Independent Committee performed its function without interference or influence of any sort by any director, officer, employee or agent of McDermott. The Committee's Report was prepared by [Cleary, Gottlieb] at the Committee's direction and under its supervision, and was adopted by the Committee without review or comment by McDermott or its counsel.

Affidavit of Edwin B. Mishkin, ¶ 5 (filed July 13, 1981).

**14.** *See* note 10 *supra.* The Committee realized that the protection of the "business judgment"

rule would not apply to defendants Smith Barney, Harris Upham & Co., Incorporated ["Smith Barney"] and Morgan Stanley & Co., Incorporated ["Morgan Stanley"], which acted as financial advisers to McDermott and B&W, respectively, during the acquisition and subsequent merger. Nevertheless, after reviewing all the circumstances surrounding activities of these firms on behalf of McDermott and B&W, and special counsel's legal analysis of the claims against them, the Committee concluded that Smith Barney and Morgan Stanley committed no improprieties that could provide the basis for liability. *See* Tweedy Affidavit, Exhibit A at 41 n.21.

"bars judicial inquiry into actions of directors taken in good faith and in honest pursuit of the legitimate purposes of the corporation." *Galef v. Alexander*, 615 F.2d 51, 57 (2d Cir. 1980); *see Abbey v. Control Data Corp.*, 603 F.2d 724, 729–30 (8th Cir. 1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980); *Abramowitz v. Posner*, 513 F.Supp. 120, 125–26 (S.D.N.Y. 1981). *See generally* Comment, *The Demand and Standing Requirements in Stockholder Derivative Actions*, 44 U.Chi.L.Rev. 168 (1976) [*"Demand and Standing Requirements"*]. In essence, defendants argue that as a matter of law the decision of the Independent Committee on Litigation not to sue on the corporation's behalf falls within the traditional formulation of the business judgment rule, thereby terminating plaintiff's right to sue derivatively. The Court agrees.

Initially, the Court notes that the law of Delaware, McDermott's state of incorporation, governs the common law claims asserted in the third amended complaint, *see Abramowitz v. Posner, supra*, 513 F.Supp. at 126, as well as the federal claims, provided Delaware law is not inconsistent with the policies underlying those federal claims, *see Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1978).[15] Recently, in *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981), the Delaware Supreme Court established the standards applicable to the instant action.

■ In *Zapata*, the court held that because Delaware law empowers a board of directors to delegate all of its authority to a committee, a properly-authorized independent committee has the authority, to the extent provided in the board's resolution, to seek the termination of litigation charging fellow directors with wrongdoing. *See* 430 A.2d at 785–86; Del. Code Ann. tit. 8, § 141(c); *accord, Abramowitz v. Posner, supra*, 513 F.Supp. at 127; *Maldonado v. Flynn*, 485 F.Supp. 274, 282 (S.D.N.Y.1980). Moreover, even if a majority of directors are interested in the transactions at issue, a board can still delegate its authority to a committee of disinterested directors. *See Zapata Corp. v. Maldonado, supra*, 430 A.2d at 786. Thus, in the instant action, the Committee was authorized to investigate plaintiff's demand and determine the corporation's course of action.

The *Zapata* court considered these issues in the context of two discrete situations. Because the demand requirement essentially involves a shareholder's standing to bring suit derivatively, one situation, and the one with which the *Zapata* court was most concerned, arises when the shareholder has standing to initiate litigation on the corporation's behalf because the demand requirement has been excused.[16] *See* 430 A.2d at 785, 787. The question then becomes whether a board committee can cause such litigation to be dismissed. The *Zapata* court stated:

[C]ircumstances may arise when continuation of the litigation would not be in the corporation's best interests. Our inquiry is whether, under such circumstances, there is a permissible procedure ... by which a corporation can rid itself of detri-

---

15. *See* discussion at pp. 695–696 *infra*.

16. For the demand requirement to be excused, demand must be deemed "futile." In *Stein I*, the Court noted that a

demand will be deemed futile where the directors themselves are allegedly involved in the challenged transaction, or are accused of self-dealing. Furthermore, a demand on the directors will be excused if the directors exhibit a clear conflict of interest or antagonism which prevents them from impartially considering the merits of the shareholder suit. But a demand on the board of directors will not automatically be deemed futile simply because all the directors are named as

defendants or because plaintiff alleges that they acquiesced in or approved the challenged transaction, absent allegations of self-dealing or bias. "It does not follow ... that a director who merely made an erroneous business judgment in connection with what was plainly a corporate act will 'refuse to do [his] duty in behalf of the corporation if [he] were asked to do so.' "

*Stein I, supra*, slip op. at 16–17 (citations omitted) (quoting *In re Kauffman Mutual Fund Actions*, 479 F.2d 257, 265 (1st Cir.) (quoting *Bartlett v. New York, N.H. & H.R.R.*, 221 Mass. 530, 536, 109 N.E. 452, 455 (1915)), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973)).

mental litigation. If there is not, a single shareholder in an extreme case might control the destiny of the entire corporation.... "To allow one shareholder to incapacitate an entire board of directors merely by leveling charges against them gives too much leverage to dissident shareholders." But, when examining the means, including the committee mechanism examined in this case, potentials for abuse must be recognized.

. . . .

If, on the one hand, corporations can consistently wrest bona fide derivative actions away from well-meaning derivative plaintiffs through the use of the committee mechanism, the derivative suit will lose much, if not all, of its generally-recognized effectiveness as an intra-corporate means of policing boards of directors. If, on the other hand, corporations are unable to rid themselves of meritless or harmful litigation and strike suits, the derivative action, created to benefit the corporation, will produce the opposite, unintended result. It thus appears desirable to us to find a balancing point where bona fide stockholder power to bring corporate causes of action cannot be unfairly trampled on by the board of directors, but the corporation can rid itself of detrimental litigation.

*Id.* at 785–87 (quoting *Lewis v. Anderson,* 615 F.2d 778, 783 (9th Cir. 1979), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980)) (citations omitted).

The *Zapata* court found its "balancing point" by requiring the trial court to perform a two-step analysis after an independent committee has investigated a derivative suit and determined that it is in the best interests of the corporation to seek its dismissal. The court must first examine the independence and good faith of the committee and the reasonableness of its conclusions, with the burden of proof placed on the corporation. If satisfied that these requirements have been met, the court must proceed to determine, in the exercise of its own business judgment, whether the suit should be dismissed. *See Zapata Corp. v. Maldonado, supra,* 430 A.2d at 788–89.

*See also Joy v. North,* 519 F.Supp. 1312, 1328 n.9 (D.Conn.1981); *Weiss v. Temporary Investment Fund, Inc.,* 516 F.Supp. 665, 670 n.13 (D.Del.1981).

■ Plaintiff argues that the Court should apply this two-step analysis to the instant action. The Court disagrees. This lawsuit is clearly one in which demand has not been excused, by prior finding of this Court. Thus, the *Zapata* court's statements that "[a] demand, when required and refused (if not wrongful), terminates a stockholder's legal ability to initiate a derivative action," 430 A.2d at 784, and "a board has the power to choose not to pursue litigation when demand is made upon it, so long as the decision is not wrongful ... if the board determines that a suit would be detrimental to the company," *id.* at 785, are directly on point. The *Zapata* court enunciated its two-step test after stating the following: "The context here is a suit against directors where demand on the board is excused. We think some tribute must be paid to the fact that the lawsuit was properly initiated. It is not a board refusal case." *Id.* at 787. Therefore, the only issue for this Court to determine is whether the Board's refusal to sue on the claims presented in plaintiff's demand letter was "wrongful."

The rationale for requiring the more elaborate two-step analysis in one situation but not the other appears to be that when demand is excused, a shareholder acquires the legal ability to initiate a derivative suit, whereas when a demand is required and properly refused, the shareholder never acquires the legal ability to sue. Moreover, the fact that demand has been excused is itself indicative of the legitimacy of a litigating shareholder's claims. Thus, a court is in a far more sensitive position when asked to dismiss a suit that has been properly commenced than when asked to dismiss an action that a plaintiff was never entitled to initiate in the first place. The balancing process is keener and necessitates less deference to the will of the board of directors.

■ Thus, the Court now turns to the question of whether the Board's refusal to sue, as expressed through its duly-constituted Independent Committee on Litigation, was wrongful.[17] In *Zapata*, the Delaware Supreme Court explained what it meant by a wrongful refusal to sue in a footnote to its statement of the rule: "In other words, when stockholders, after making demand and having their suit rejected, attack the board's decision as improper, the board's decision falls under the 'business judgment' rule and will be respected if the requirements of the rule are met." 430 A.2d at 784 n.10. Recently, Judge Weinfeld of this district concisely stated those requirements: If a "[c]ommittee, composed of independent and disinterested directors, conducted a proper review of the matters before it, considered a variety of factors and reached, in good faith, a business judgment that [the] action [is] not in the best interest" of the corporation, the action must be dismissed. *Maldonado v. Flynn, supra,* 485 F.Supp. at 286. *See generally Demand and Standing Requirements, supra,* at 193–98; *see also United Copper Securities Co. v. Amalgamated Copper Co.,* 244 U.S. 261, 263–64, 37 S.Ct. 509, 510–11, 61 L.Ed. 1119 (1917). In the instant action, the Court finds that this standard has been met as a matter of law.

*Independence*

■ Plaintiff argues that the Committee was not independent and disinterested because (1) Bailey, Cunningham, Graves and Richie, the defendants who participated in the improper payments, attended the meeting during which the Committee was appointed, and (2) three members of the Board cannot impartially assess the actions of their fellow directors, friends and associates.

The first contention is disposed of easily. Plaintiff has produced no evidence by way of affidavit or otherwise to support her claim that these four defendants attended the September 25 meeting in New Orleans, but even if this could be established, the Court fails to see its relevancy. Bailey, Cunningham, Graves and Richie are clearly interested in the disputed transactions, but the *Zapata* court has held that even when a majority of the board is interested, the board can still delegate its authority to a committee of disinterested directors. *See* 430 A.2d at 786. If the Court were to adopt plaintiff's reasoning, which suggests that interested directors be excluded from a meeting held to appoint an independent committee, the Court can envision a situation whereby too few directors are present to constitute a quorum. Since this would undermine the efficacy of the rule, plaintiff's first point is rejected.

Plaintiff's second point is more troublesome. It would be naive to believe that a few directors, no matter how uninvolved in the transactions at issue, would have no sense of loyalty to the other members of the Board. The Delaware Supreme Court's observation that "[t]he question naturally arises whether a 'there but for the grace of God go I' empathy might not play a role," is pertinent. *Zapata Corp. v. Maldonado, supra,* 430 A.2d at 787. Therefore, although it does not follow that such a committee is per se not independent, the Court believes it is appropriate to place on the committee members the burden of producing strong evidence of their independence and disinterestedness. *But see Ash v. IBM, Inc.,* 353 F.2d 491, 493 (3d Cir. 1965), *cert. denied,* 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966).

Initially, the Court notes that the three members have established by affidavit that

---

**17.** Defendants argue that because plaintiff does not allege in the third amended complaint that the Board's refusal to sue was wrongful, she has failed to state a claim for relief. Fed.R. Civ.P. 12(b)(6). The Court finds, however, that the failure to allege wrongfulness is not dispositive because (1) it would be an overly technical pleading requirement, and (2) the third amend-

ed complaint was filed prior to the Delaware Supreme Court's decision in *Zapata*, which set forth the applicable standard. The Court's duty is to determine, in a manner not limited to a literal reading of the complaint's allegations, whether the facts indicate that the refusal to sue was wrongful.

they were not in any way involved in the transactions at issue or in the preparation of the Audit Committee's Report. None were affiliated with McDermott at the time of the alleged transactions. None are now or ever were eligible to receive stock under the 1968 and 1974 stock plans. In short, none had a personal financial stake in the outcome of the litigation.

Moreover, there is absolutely no evidence that the Committee members held opinions about these matters prior to their appointment to the Committee, or that the members interacted with other directors in any manner to suggest even the appearance of impropriety. Indeed, Chairman Tweedy took the prudent step of retaining as independent outside counsel, for the purpose of advising the Committee on the full scope of its responsibilities, a law firm known in this legal community for its high professional standards. Thus, the Committee members not only lacked a financial interest in the litigation, but also endeavored to ensure they would remain unaffected by any potentially improper influences. Accordingly, the Court finds that the Committee was sufficiently independent and disinterested to satisfy the first requirement of the business judgment rule.

*Proper Investigation*

Plaintiff argues that the Committee did. not conduct a proper investigation of the issues raised in her demand letter, because (1) it was ready to make a tentative determination with respect to the stock plan claims after just two meetings and interviewing just two people, and (2) its decision was predicated upon the Audit Committee's Report without conducting an independent investigation of the Audit Committee's investigation.

With respect to plaintiff's first contention, the Court notes that a "tentative" determination is by definition not final. Indeed, plaintiff has neither suggested that the members of the Committee prejudged the issues before them, nor brought to the Court's attention any evidence to support such a conclusion.

Moreover, plaintiff's characterization of the status of the investigation after two meetings misstates the substance of the investigation to that point. Prior to the October 8, 1980 meeting, the members of the Committee had reviewed the Audit Committee Report as well as minutes of meetings of the Audit Committee and the full McDermott Board relating to that Report. They had also reviewed the second amended complaint and the Court's decision in *Stein I.* In addition, the two people interviewed at that meeting—the chairman of the Audit Committee and its special counsel—were clearly the two persons with the most pertinent knowledge of the facts relative to the stock plans claims, and both described their involvement in the Audit Committee's investigation in detail. In short, by the end of the second meeting, the Committee members had given substantial consideration to the issues raised by these claims and were prepared to reach a tentative conclusion with respect thereto. Even after doing so, the Committee directed its special counsel to prepare a legal assessment of plaintiff's claims prior to its next meeting on November 3.

With respect to plaintiff's second point, the Court finds that the Committee did not reach its decision in blind reliance on the Audit Committee's Report. Rather, each Committee member thoroughly reviewed that report, and the Committee supplemented this review by interviewing the Audit Committee's chairman and special counsel. The Court believes that the procedure followed by the Committee comported with its responsibility both to conduct a first-hand investigation and to utilize reliable secondary sources where practicable. The Court has reviewed the Audit Committee Report and finds it to be comprehensive. Thus, it would be unreasonable to require the Committee to conduct an investigation of the Audit Committee's already comprehensive investigation, or to re-do the Audit Committee's work. *See Abramowitz v. Posner, supra,* 513 F.Supp. at 131–33. In short, the Court finds that the Committee conducted a reasonable and thorough investigation of the stock plan claims.

In addition, the Committee interviewed McDermott's chief financial officer regarding the B&W acquisition and considered special counsel's legal analysis of the acquisition claim. The Court finds that the Committee's focus on the purposes of the merger, the role of the Board and other participants in the tender offer decision-making, the alternative courses of conduct available to McDermott at the time, and the expected and actual operating results following the acquisition, constitutes a reasonable investigation of the acquisition claims.

*Good Faith*

Finally, plaintiff argues that the Committee's decision to recommend that the Board not institute suit on her claims was not made in good faith, because (1) the Committee's investigation was perfunctory and not thorough, (2) the Committee had reached its determination before completing its ultimately inadequate investigation, and (3) the decision not to compel Bailey, Cunningham, Graves and Richie to surrender the shares they obtained under the stock plans was unsupportable.

The Court's focus in this area is intertwined with its analysis of whether the Committee conducted a reasonable investigation. " 'Proof ... that the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham ... would raise questions of good faith ....' " *Abramowitz v. Posner, supra,* 513 F.Supp. at 132 (quoting *Auerbach v. Bennett,* 47 N.Y.2d 619, 634–35, 393 N.E.2d 994, 1002, 419 N.Y.S.2d 920, 929 (1979)). In light of the discussion and resolution of this issue in the previous section of this Memorandum and Order, the Court rejects plaintiff's first two contentions.

With regard to plaintiff's third contention, irrespective of the other reasons why the Committee chose not to sue on the stock plan claims, the Committee believed that the sanctions imposed on the four individuals most directly involved were sufficient. The Court agrees that to have further punished these four executives, who acted not to enrich themselves at the company's expense but in a misguided pursuit of the company's interest, would have been counterproductive. As found by the Committee, the executives involved had already been subjected to an array of civil and criminal proceedings, which had exacted a serious toll on the individuals as well as the company. Moreover, the reforms instituted at the recommendation of the Audit Committee had so far been successful and made recurrence unlikely. Thus, the Court finds that the Committee's decision that McDermott should, in effect, put this episode behind it was made in good faith.

In light of the foregoing, the Court concludes that the decision of the Committee satisfied the requirements of the business judgment rule—a judgment reached in good faith by independent and disinterested directors after a reasonable and thorough investigation. Accordingly, as a matter of law, the refusal to sue was not wrongful under Delaware law. *See Zapata Corp. v. Maldonado, supra.*

*Policies Underlying Federal Claims*

As noted previously, Delaware law regarding the business judgment rule is applicable to the federal claims in plaintiff's third amended complaint as long as that law is consistent with the policies underlying those claims. *See Burks v. Lasker, supra,* 441 U.S. at 480, 99 S.Ct. at 1838. Because plaintiff alleges violations of sections 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(a), in connection with the 1968 and 1974 stock plans, the Court must identify the congressional purposes reflected in these statutes and determine whether the business judgment rule infringes thereon.

In *Abramowitz v. Posner, supra,* 513 F.Supp. 120, Judge Haight accurately observed that both section 10(b) and section 14(a) "are part of a comprehensive regulatory scheme designed to protect investors and prevent manipulation of stock prices." *Id.* at 131. Thus, Judge Weinfeld's reasoning in *Maldonado v. Flynn, supra,* 485 F.Supp. 274, a case involving a claim arising under section 14(a), is equally persuasive in a section 10(b) case. After reviewing the

Supreme Court's analysis in *Burks v. Lasker* of a suit brought pursuant to the Investment Company Act, Judge Weinfeld stated:

> In the first instance, it is clear that the [business judgment] rule does not infringe directly upon the protections accorded investors by the regulatory scheme of section 14(a). It does not condone conduct violative of that section. Further, it may be noted that protection of investors is also a fundamental purpose of the Investment Company Act. Indeed that Act contains a provision concerned with proxies analogous to section 14(a). In *Burks*, as noted, the Court strongly indicated that a rule such as the one involved here was consistent with the Investment Company Act. Thus an underlying policy of investor protection was not regarded as necessarily inconsistent with the business judgment rule in appropriate circumstances.
>
> . . . .
>
> The cornerstone of the business judgment rule is the independence and disinterestedness of the directors charged with responsibility for decisions. It requires a group of directors who are genuinely independent of the disqualified board and disinterested in the action; it requires them to exercise their business judgment in fact and to do so in good faith. No court is required to take for granted that these conditions have been met and the shareholder is free to challenge the committee's bona fides. With these inherent limitations in play, there is simply no merit to plaintiff's contention that application of the business judgment rule in the instant case renders section 14(a) meaningless or is inconsistent with the basic policy underlying that section.

485 F.Supp. at 281–82 (footnotes omitted). *See Lewis v. Anderson, supra*, 615 F.2d at 783–84 (sections 10(b) and 14(a)); *Abbey v. Control Data Corp., supra*, 603 F.2d at 730–32 (section 14(a)). The Court agrees with Judge Weinfeld's reasoning and conclusion. Accordingly, the Court finds that the application of Delaware's business judgment rule to plaintiff's section 10(b) and section 14(a) claims is consistent with the policies underlying those sections. Therefore, the business judgment rule applies to the Committee's decision not to sue on the stock plan claims as alleged in plaintiff's demand letter.

### CONCLUSION

In accordance with the foregoing, defendants' motion for summary judgment is granted. Fed.R.Civ.P. 56.

The additional motion by defendant Morgan Stanley & Co., Incorporated, to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), is dismissed as moot.

The Clerk of the Court is directed to prepare and enter Judgment dismissing the third amended complaint.

SO ORDERED.