**In re ORACLE CORP. DERIVATIVE LITIGATION.**

**C.A. No. 18751.**

Court of Chancery of Delaware,
New Castle County.

Submitted: June 27, 2002.
Decided: July 10, 2002.

Victor F. Battaglia, Sr. and Robert D. Goldberg, Esquires, of Biggs & Battaglia, Wilmington, Delaware; Of Counsel: Steven E. Cauley, Esquire, of Cauley, Geller, Bowman & Coates, Little Rock, Arkansas; Paul J. Geller, Howard K. Coates, Jr., and Jonathan M. Stein, Esquires, of Cauley, Geller, Bowman & Coates, Boca Raton, Florida; John G. Emerson, Jr., Esquire, of the Emerson Firm, Little Rock, Arkansas; Marc A. Topaz and Robert B. Weiser, Esquires, of Schiffrin & Barroway, Bala Cynwyd, Pennsylvania, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Attorney for the Individual Defendants.

David C. McBride, Adam W. Poff, and Christian Douglas Wright, Esquires, of Young Conaway Stargatt & Taylor, Wilmington, Delaware; Of Counsel: George Newcombe, James G. Kreissman, and Alexis Coll, Esquires, of Simpson Thacher

& Bartlett, Palo Alto, California, Attorneys for Nominal Defendant Oracle Corporation.

## OPINION

STRINE, Vice Chancellor.

This is a derivative action brought in the name of Oracle Corp., a Delaware corporation. The Oracle stockholders who filed this action as derivative plaintiffs now seek to dismiss this action voluntarily, over the objection of Oracle's "Special Litigation Committee," which has been empowered to investigate and decide whether to prosecute this action. By their dismissal motion, the moving derivative plaintiffs do not hope to terminate all litigation relating to the claims asserted in this action. Rather, the "Delaware Derivative Plaintiffs" seek to dismiss only this case, leaving derivative actions involving the same subject matter pending in the state and federal courts of California.

To permit the Delaware Derivative Plaintiffs to dismiss this action over the opposition of the Special Litigation Committee would usurp that Committee's legitimate authority. During the time period reasonably needed for the Committee to perform its investigation and decide on its course of action, the Committee has primacy in controlling this litigation on behalf of Oracle. If the Delaware Derivative Plaintiffs were allowed to dismiss this action, the Special Litigation Committee's range

of action would be impinged in contravention of the substantive law of this state, as reflected in 8 *Del. C.* § 141(a),[1] (c)(2)[2] and the line of cases under *Zapata Corp. v. Maldonado.*[3]

### I.

Oracle is a corporation "organized under the laws of the State of Delaware," with its principal place of business in California.[4] It supplies software that aids in the management of business enterprises.

This derivative action has been brought in Oracle's name. The original complaint was filed on March 12, 2001 by the law firms of Millberg, Weiss, Bershad, Hynes & Lerach and Cauley, Geller, Bowman & Coates. The same day, Millberg Weiss filed a virtually identical derivative action in Oracle's name in the state courts of California.

These derivative complaints were filed on the heels of an earlier federal securities class action filed by Millberg Weiss against Oracle and certain of its officers and directors.[5] Eventually, Millberg Weiss withdrew from the derivative actions because its federal suit seeking damages against Oracle conflicted with its ability to represent plaintiffs seeking damages on behalf of Oracle.

As is by now expected in these circumstances, the initial derivative complaints were followed by later complaints. All of the Delaware complaints were consolidated

---

1. "The business and affairs of every corporation ... shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."

2. "The board of directors may designate 1 or more committees....Any such committee, to the extent provided in the resolution of the board of directors, or in the bylaws of the corporation, shall have and may exercise all the powers and authority of the board of

directors in the management of the business and affairs of the corporation...."

3. 430 A.2d 779 (Del.1981).

4. Calif. Cons.Deriv. Compl. ¶ 17.

5. That action was dismissed without prejudice on March 12, 2002. Briefing on a motion to dismiss the plaintiffs' amended complaint is now being completed in that case.

under the caption of this suit, with the law firms of Schriffin & Barroway; Cauley, Geller, Bowman & Coates; and the Emerson Law Firm named as co-lead counsel. All of the California state court actions were eventually consolidated into one suit as well (the "California State Derivative Action"), with the law firms of Berman, DeValerio, Pease, Tabacco, Burt & Pucillo and Corey, Luzaich, Pliska, de Ghetaldi & Nastari acting as co-lead counsel. A separate derivative suit was also filed in federal court in California (the "California Federal Derivative Action").

## II.

Regardless of forum, the derivative claims filed on Oracle's behalf all center on a core allegation. To wit, the derivative plaintiffs allege that certain Oracle officers and/or directors—Michael J. Boskin,[6] Lawrence J. Ellison,[7] Jeffrey O. Henley,[8] and Donald L. Lucas[9]—sold over thirty million of their own shares in January 2001 for prices as high as $33.50 per share. This was at a time when these "Oracle Insiders" allegedly possessed material, nonpublic information regarding the company. Specifically, it is contended that the selling Insiders knew that Oracle was likely to fall far short of its projected earnings and revenues for that quarter in the company's fiscal year, and that the company's prospects for the remainder of the fiscal year were highly uncertain. This information contradicted optimistic statements that Oracle had made to market analysts in December and January 2001, which had allegedly bolstered Oracle's stock price.

Despite knowing that the company's previous statements to the marketplace were misleading, the Oracle Insiders did not promptly correct them. Instead, it is alleged, they advantaged themselves unfairly at the expense of others by selling their stock in advance of Oracle's public announcement of this bad news.

On March 1, 2001, Oracle finally released the news that its earnings for the quarter would fall short of projections, that its revenues were $200 million below publicly released expectations, and that the company's outlook for the final quarter of fiscal year was unclear. According to the Derivative Plaintiffs, these revelations caused Oracle's stock price to drop to a yearly low of $15.75, or by over forty percent. The depressive effect of this announcement on the company's stock price allegedly continues to this day.

In the Delaware Derivative Action, the Derivative Plaintiffs allege that the Oracle Insiders' alleged malfeasance constitutes a breach of their fiduciary duties to Oracle. As relief, the Delaware Derivative Plaintiffs seek, among other things, a constructive trust over the Oracle Insiders' trading profits, and damages for the loss in goodwill and any costs incurred by Oracle in connection with numerous federal securities actions brought as a result of the Oracle Insiders' stock sales. The Delaware Derivative Plaintiffs also label this alleged misconduct as "illegal insider trading" and "misappropriation of corporate assets," terms that in the context of state law claims seem to describe the type of fiduciary duty claims asserted, rather than to constitute independent causes of action. For that reason, perhaps, those labels are included in one of the three counts for

6. Boskin is an Oracle director.

7. Ellison is Oracle's chairman of the board and chief executive officer.

8. Henley is chief financial officer, executive vice president, and a director of Oracle.

9. Lucas is a director and chairman of Oracle's Executive Committee.

breach of fiduciary duty pled in the amended complaint. The Delaware Derivative Plaintiffs have also sued the other members of the Oracle board, who were in office at the time of the Insiders' sales, but who did not engage in sales themselves during the supposedly critical period.

In the California State Derivative Action, the derivative plaintiffs sued only the Oracle Insiders. The "California State Derivative Plaintiffs" essentially pled the same breach of fiduciary duty claims as the Delaware Derivative Plaintiffs, as well as two additional counts not present in the Delaware complaint. The first is a count for unjust enrichment, which seeks restitution and disgorgement against the Oracle Insiders. The second is a claim under California Corporations Code §§ 25402 and 25502.5(a). Under those statutes, an insider of an issuer who profits by stock trades while in possession of material, nonpublic information is liable to the issuer for treble his illicit trading profits, plus litigation costs.

The California Federal Derivative Action involves claims for relief that are functionally identical to those pending in the California State and Delaware Derivative Actions.

After the various Derivative Actions were commenced, events did not move with any particular urgency. Most pertinently, consolidated amended complaints were not filed in the Delaware Derivative and California State Derivative Actions until October 9, 2001[10] and January 28, 2002, respectively. In the Delaware Derivative Action, the Derivative Plaintiffs did not press for a scheduling order or a prompt reply to the amended complaint. By late 2001, however, the Delaware Derivative Plaintiffs did insist that the defendants file

an answer to an extensive, sixty-two page amended complaint. That answer was filed on February 8, 2002.

Shortly before that date—on February 1, 2002—Oracle's board of directors took action that appears partly to have inspired the motion now before the court. That day, the Oracle board established the Special Litigation Committee, which is empowered to investigate the claims alleged in the Delaware Derivative Action and determine whether to prosecute, settle, or dismiss those claims on behalf of Oracle—to the exclusion of the other members of the Oracle board of directors. Within a short time thereafter, the Special Litigation Committee's charge was expanded to encompass the California State and Federal Derivative Actions as well. The Committee's members are Joseph A. Grundfest and Hector Garcia–Molina, two Stanford University professors added to the Oracle board after the events giving rise to the derivative suits. On this motion, no challenge to the independence or disinterestedness of the Special Litigation Committee members has been mounted.

The Special Litigation Committee has retained Simpson, Thacher & Bartlett and Young Conaway Stargatt & Taylor as its legal advisors, and National Economic Research Associates as its financial and economic advisor. With the help of its advisors, the Special Litigation Committee has begun its factual and legal investigation of the claims raised in the various Derivative Actions by, among other things, gathering numerous documents and scheduling interviews with persons who might have knowledge of relevant information. The Committee hopes to make its decision about how to proceed by early autumn.

---

**10.** The Delaware Derivative Plaintiffs filed an initial amended complaint on September 27, 2001 but revised it on October 9, 2001.

## III.

The formation of the Oracle Special Litigation Committee is consistent with the substantive law of Delaware, as articulated in *Zapata v. Maldonado*.[11] *Zapata* permits a corporation to use a special litigation committee to restore control over derivative litigation if a group of independent directors is so empowered to act for the corporation. So long as the committee's actions withstand judicial review under the standards set forth by the Supreme Court in its *Zapata* opinion, a special litigation committee may decide to dismiss an action, or to prosecute it, in the manner of its choosing.

Within weeks of being informed of the formation of the Special Litigation Committee and within days of the dismissal without prejudice of the federal securities class action filed against the Oracle Insiders, the Delaware Derivative Plaintiffs filed a motion under Court of Chancery Rule 41(a)(2) to dismiss this action voluntarily.[12] The motion constituted a reversal in position, because the Delaware Derivative Plaintiffs had recently insisted that the defendants investigate and answer their lengthy amended complaint.

In their reply brief on this motion, however, the attorneys for the Delaware Derivative Plaintiffs claim that they reached an agreement in February, 2002 with the attorneys for the California State Derivative Plaintiffs that it would be more efficient and convenient if only one derivative suit involving the alleged insider trading were litigated. Thus, they sought dismissal of the year-old Delaware Derivative Ac-

tion, in which the defendants had already incurred the time and expense of answering the detailed, sixty-two page amended complaint. The Delaware Derivative Plaintiffs disavow any substantial connection between the formation of the Special Litigation Committee and their desire to seek dismissal of the Delaware Derivative Action.

## IV.

 Because the defendants have answered the amended complaint in this Action, the Delaware Derivative Plaintiffs' motion for voluntary dismissal arises under Court of Chancery Rule 41(a)(2). Such a motion will not be granted if dismissal would result in "plain legal prejudice" to the defendants.[13] In this situation, the fundamental problem with the Delaware Derivative Plaintiffs' motion is that they ask this court to take action that would prejudice the ability of the Special Litigation Committee—if it acts in an independent and informed manner that demands judicial respect under the standards articulated in *Zapata*[14]—to control if, how, and where Oracle would press any claims arising out of the alleged insider trading.

 When a special litigation committee is empowered to decide whether and in what manner a derivative suit should proceed, "the *Zapata* procedure takes the case away from the [derivative] plaintiff, turns his allegations over to special agents appointed on behalf of the corporation for the purpose of making an informal, internal investigation of his charges, and places the plaintiff on the defensive [if a] motion to dismiss is filed by the a special litigation

---

**11.** 430 A.2d 779 (Del.1981).

**12.** That Rule provides, in pertinent part, that "an action shall not be dismissed at the plaintiff's instance save upon order of the Court and upon such terms and conditions as the Court deems proper."

**13.** *Draper v. Gardner Defined Plan Trust*, 625 A.2d 859, 863 (Del.1993).

**14.** 430 A.2d 779.

committee ...." [15] For that reason, this court has acknowledged its duty to stay derivative actions at the instance of a special litigation committee, "pending the investigation and report of the Committee .... Otherwise, the entire rationale of Zapata, *i.e.*, the inherent right of the board of directors to control and look to the well-being of the corporation in the first instance, collapses." [16]

In another of its decisions, this court rejected a derivative plaintiff's request to take discovery simultaneously with a special litigation committee's investigation. In so ruling, this court stated:

If *Zapata* is to be meaningful, then it would seem that such an independent committee, once appointed, should be afforded a reasonable time to carry out its function. It would likewise seem reasonable to hold normal discovery and other matters in abeyance during this interval. If a derivative plaintiff were to be permitted to depose corporate offi-

---

**15.** *Kaplan v. Wyatt,* 484 A.2d 501, 509 (Del. Ch.1984), *aff'd,* 499 A.2d 1184 (Del.1985).

**16.** *Kaplan,* 484 A.2d at 510. Other cases to the same effect include *Katell v. Morgan Stanley Group, Inc.,* 1993 WL 390525, at *4 (Del. Ch.), and *Pompeo v. Hefner,* 1983 WL 20284, at *2 (Del.Ch.). It is true that in one Delaware case, a member of this court permitted derivative plaintiffs to take discovery on the merits while a special litigation committee was undertaking its investigation. That case, however, is the type of exception to general practice that tends to prove the rule.

In *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* 1996 WL 33167168, tr. (Del. Ch.), a special litigation committee was formed eighteen months after the derivative litigation commenced. Unlike the current case in which the only substantial action taken by the derivative plaintiffs has been the filing of an amended complaint, the plaintiffs in *Carlton Investments* had already litigated and defeated a motion to dismiss, and had already completed document discovery and eight weeks of depositions before the special litigation committee stepped in to try to call a halt. As the plaintiffs' lawyer in that case noted, no other case in Delaware had "ever presented anything like" that situation. 1996 WL 33167168, at *5.

The oral ruling of the court in *Carlton Investments* to permit discovery to continue was consistent with *Zapata,* because the court refused to allow a special litigation committee to stymie derivative plaintiffs after the company had permitted full-blown, expensive pre-trial proceedings to proceed for over a year and a half. *Zapata* contemplates that this court will oversee special litigation committee tactics in order to avoid abuse. *See, e.g., Abbey v. Computer & Communications Tech.*

*Corp.,* 1983 WL 18005, at *3 (Del.Ch.) (special litigation committee may control derivative litigation to the exclusion of the derivative plaintiffs until such time as the court concludes, among other possibilities, that the committee is acting unreasonably). The unique factors present in *Carlton Investments* do not pertain here. Any delay in Oracle's formation of the Special Litigation Committee here is more than overcompensated for by the languid pace of the Derivative Plaintiffs in the various actions.

Indeed, in a later opinion in the *Carlton Investments* case, Chancellor Allen limited the discovery the plaintiffs could take in opposing a settlement proposed by the special litigation committee, and noted that:

[O]nce a special litigation committee has entered into a proposed settlement with defendants, a derivative plaintiff is no longer entitled to engage in expansive discovery, but rather must tailor its discovery requests to the narrow scope of the inquiry appropriate for the state in the proceeding .... Under the first step of the *Zapata* test, the Court must 'inquire into the independence and good faith of the committee and the bases supporting its conclusion. Limited discovery may be ordered to facilitate such inquiries'.... [D]iscovery into the merits of the derivative plaintiff claims are generally or presumptively beyond the scope of this inquiry.... The efficiency of the utilization of a special litigation committee would be defeated, at the least in part, by permitting full discovery on the merits by a party objecting to the committee's recommendation, without any showing of evidence that the committee did not proceed in good faith. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* 1997 WL 38130, at *3 & n. 4 (Del.Ch.).

cers and directors and to demand the production of corporate documents, etc. at the same time that a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation to permit the suit to go forward, the very justification for the creating of the litigation committee in the first place might well be subverted. Likewise, in effect, it would likely amount to simultaneous discovery of the same persons and materials by two separate sources, both allegedly acting on behalf of the corporation. . . .

Plaintiff contends that as a party plaintiff in a pending suit she has the subpoena power of the Court and other discovery tools available to her which, arguably, the Litigation Committee does not . . . . For this reason, she argues that discovery by her should be permitted to go forward even while the Litigation Committee goes about its task.

This, however, is nothing more than an argument that if permitted she could possibly do a better job of investigating the matter than could the Litigation Committee.

The determining factor, however, is not who could do the better job. Again, the focus in *Zapata* was on the right of a derivative plaintiff to maintain an action after it had been properly filed in a "demand excused" situation. The purpose of the independent committee as authorized by *Zapata* is to act as an independent arm of the ultimate power given to a board of directors under 8 *Del. C.* § 141(a) to determine whether or not a derivative plaintiff's pending suit brought on behalf of the corporation should be maintained when measured against the overall best interests of the corporation. If the purpose is to determine the right of the plaintiff to maintain the suit, then it would seem that the right of the independent committee to investigate and report its findings must take priority over any entitlement of the plaintiff to go forward with the pending action. Thus, I think that a stay of all proceedings in this case is proper.[17]

■ The deference Delaware law pays to the special litigation committee process is a matter of our state's substantive, not procedural, law.[18] It is among the many important policy choices that our state has made regarding the circumstances when it is appropriate to divest the board of directors of a Delaware corporation of a portion of its statutory authority to manage the corporation's affairs, *i.e.*, its right to control litigation brought on behalf of the corporation.[19] And these choices are

---

17. *Abbey v. Computer & Communications Tech. Corp.*, 457 A.2d 368, 375–76 (Del.Ch. 1983).

18. *See, e.g., Draper v. Gardner Defined Plan Trust*, 625 A.2d 859, 865 & n. 9 (Del.1993) (law of demand excusal is substantive, not procedural, and citing several other cases to that effect); *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 96–97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (corporate law allocating power between board of directors and stockholders over the procession of derivative actions is substantive, and not merely procedural, in nature).

19. *See Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del.1990) ("The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation."); 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors. . . ."); *see also Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984) (it is a "basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made

properly made by the state whose law governs the corporation, because that is the law that the corporation's stockholders have chosen to govern the firm and their relationship with it. Indeed, if the internal affairs of business corporations were not governed solely by the law of their chosen domicile, and were instead subjected to a myriad of inconsistent and supplemental requirements by other states, the burden on the rights of stockholders to carry out joint economic activity through the corporate form would be markedly impaired, to their detriment, and likely to the nation's.[20]

Here, the Delaware Derivative Plaintiffs seek to dismiss this case over the objection of the Oracle Special Litigation Committee. That is, they wish to usurp the authority of the Committee before the Committee has even had a reasonable time to complete its review and investigation. In my view, such an intrusion on the putative authority of the Committee would be even more substantial than allowing the Delaware Derivative Plaintiffs to proceed with discovery during the Committee's process.

At the end of their investigation, the Oracle Special Litigation Committee might choose to press all or some of the various claims raised in Delaware, California State, and California Federal Derivative Actions. The Special Litigation Committee might, however, prefer to litigate all of those claims in one of the three forums, and to stay or dismiss the other two actions. Indeed, the Special Litigation Committee has informed this court that it is likely to take this approach, if it chooses to prosecute claims based on the trading of the Oracle Insiders.

Likewise, the Special Litigation Committee might choose to seek dismissal of all or some of the claims. In its discretion, it might file its dismissal motion in one of the three actions, and request that a particular court first decide the issue of whether its deliberations must be respected under the standard articulated in *Zapata*. Once a final judgment on that issue has been entered in that forum, presumably other forums would give it full faith and credit.[21]

by the board of directors....") (citations omitted).

20. As the United States Supreme Court stated in *CTS Corp. v. Dynamics Corp. of America:*
The markets that facilitate [the] national and international participation in ownership of corporations are essential for providing capital not only for new enterprises but also for established companies that need to expand their businesses. This beneficial free market system depends at its core upon the fact that a corporation—except in the rarest situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation.
481 U.S. 69, 90, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987).

21. *See Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 373, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (Full Faith and Credit Act "directs all courts to treat a state court judgment with the same respect that it would receive in the

courts of the rendering state"); *Draper,* 625 A.2d at 864–65 ("The California courts will have to apply appropriate choice of law principles in accordance with the laws of that jurisdiction and the United States Constitution. Under the internal affairs doctrine, the law of the state of incorporation (Delaware) would apply to matter of substantive law raised in the Delaware and California state court proceedings.); *see also Kamen,* 500 U.S. at 98, 111 S.Ct. 1711 ("'Corporations' ... 'are creatures of state law,' ... and it is state law which is the font of corporate directors' powers.") (internal citations omitted); *CTS Corp.,* 481 U.S. at 89, 107 S.Ct. 1637 ("No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations....") (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 304 (1971) (concluding that the law of the incorporating State generally should "determine the right of a shareholder to participate in the administration of the corporation")).

In exercising its discretion, the Special Litigation Committee might also take cognizance of the nature of the claims at issue, and the substantive law governing them. In this case, for example, the Oracle Insiders are alleged to have breached their fiduciary duties to Oracle by engaging in insider trading. Among the remedies sought on behalf of Oracle is payment of any trading profits to the corporation. In the recent case of *Goldman v. Isaacs*,[22] this court asked the parties to comment on whether a Delaware corporation can recover such profits against an insider who has engaged in illicit trading, absent a showing of harm to the corporation. When it sought this input, the court noted that the Delaware case—*Brophy v. Cities Service Co.*[23]—that supported a recovery of the insider's trading profits in the absence of corporate harm was so venerable as to pre-date much of the pertinent federal law, in particular that arising under Securities and Exchange Commission Rule 10b–5. As a result, the court was interested in whether these federal law developments undermined *Brophy*, because, among other concerns, allowing corporations to recover trading profits under state corporate law could potentially subject corporate insiders to double liability, given their exposure to liability under Rule 10b–5. After the court requested the parties' views on these inter-

esting issues, the *Goldman* case resolved itself, obviating the need for a ruling on the motion that provoked the court's inquiry. Because of the arguably unsettled nature of the Delaware law issues raised by the fiduciary claims against the Oracle Insiders, the Special Litigation Committee might choose to have those claims litigated in Delaware, rather than elsewhere. A preference by the Committee to have the courts of the state whose substantive law governs the corporation resolve its claims could hardly be seen as irrational.[24]

To permit the Delaware Derivative Plaintiffs to dismiss this Action would cabin the flexibility available to the Special Litigation Committee and undermine its discretion to act on behalf of Oracle. Like a decision to permit discovery to proceed simultaneously with the Special Litigation Committee's investigation, a decision to grant the motion before me would disrespect the authority granted to Oracle's Special Litigation Committee under the law of our state.[25] Therefore, in accordance with *Zapata* and its progeny, I deny the Delaware Derivative Plaintiffs' motion to dismiss.

Because the motion must be denied on other grounds, I need not address the defendants' alternative grounds for objecting to dismissal of this case.[26] I do note,

22. 2001 WL 1671439 (Del.Ch.).

23. 70 A.2d 5 (1949).

24. *Cf. Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 577–78 (7th Cir.1996) ("Recognizing the nationwide application of Delaware corporate law, and the benefits of making that law more certain, we think the best way to resolve a [debate about Delaware law] is to ask the Supreme Court of Delaware. Only that court can give a definitive answer.").

25. *See* 8 *Del. C.* § 141(a), (c)(2); *Zapata*, 430 A.2d 779.

26. The only substantial reasons given by the Delaware Derivative Plaintiffs for their tardy

decision to seek dismissal are: (1) their desire to have all the claims common to the various actions litigated in one place; and (2) the fact that California is the state in which most of the evidence is located. Putting aside the Special Litigation Committee, these reasons would not mandate dismissal even if the motion to dismiss were only opposed by the individual defendants. Although the individual plaintiffs in the various actions may be different, it is clear that the multiple law firms who brought them are no strangers to having similar or identical actions pending in more than one court at a time, and that this was so in this case. It was the various Derivative Plaintiffs and their lawyers who chose to sue

however, that the defendants have produced evidence that supports the inference that the California State Derivative Plaintiffs are seeking to have the California state courts ignore the substantive law of this state regarding the appropriate deference due a special litigation committee of a Delaware corporation. Apparently, the California State Derivative Plaintiffs intend to argue that the Delaware corporate law articulating the need to defer to a special litigation committee's request for a stay during its investigation is merely "procedural" in nature, and not an aspect of this state's substantive corporate law. The California State Derivative Plaintiffs therefore seek to take merits discovery simultaneous with the Special Litigation Committee's inquiry, and have refused to stay discovery voluntarily. The defendants contend that the California court handling the California State Derivative Action has already adopted the view that Delaware's law regarding the deference due to a special litigation committee during its investigation is merely procedural and is permitting discovery that would be denied under the line of cases following *Zapata*, as being inconsistent with the Special Litigation Committee's authority.[27]

The California State Derivative Plaintiffs' arguments do seem to fly in the face of clear pronouncements by the Delaware Supreme Court and, indeed, by the United States Supreme Court, that the law governing the circumstances in which a board's ability to control corporate litiga-

---

in three different courts, and it was the Delaware Derivative Plaintiffs who chose this state as a convenient forum over a year before bringing their dismissal motion. *See Catibayan v. Fischer Eng'g & Maintenance Co.*, 1997 WL 666969, at *2–*3 (Del.Ch.) (denying a Rule 41(a)(2) motion predicated on plaintiffs' desire to litigate elsewhere, in part, because plaintiffs waited many months to file the motion and because "plaintiffs cannot now be heard to claim that litigation in two jurisdictions will be a burden when it is plaintiffs alone who are responsible for the dual proceedings"); *In re Walt Disney Co. Derivative Litig.*, 1997 WL 118402, at *4 (Del.Ch.) ("If inconvenience is the reason for litigation in California, no legitimate reason has been offered why these cases were filed in Delaware in the first place."). The Delaware Derivative Plaintiffs' newly felt regard for litigative efficiency is not a weighty concern, especially given the applicability of Delaware law to this dispute and the legitimate interest of the defendants in having this state's courts grapple with some of the difficult issues raised by the claims against the Oracle Insiders.

The words of Chancellor Chandler in denying a Rule 41(a)(2) motion in a prior case resonate here:

Delaware is especially appropriate as a forum to resolve questions of Delaware law when a plaintiff has consciously and deliberately chosen this forum and when director defendants have willingly agreed to defend in this forum .... I do not believe that equity or fairness is served by allowing plaintiffs' counsel to repudiate the jurisdiction in which they have deliberately chosen to litigate, a jurisdiction they selected while fully aware of the convenience and efficiency concerns that they now invoke as grounds for suspending operations on the Delaware front and moving to an alternative battle ground. One must wonder what theory of judicial efficiency or comity would promote a rule that encourages plaintiffs' counsel to file in multiple jurisdictions, force defendants to commit resources from coast to coast, and then allow plaintiffs' counsel, at their own whim, to move the lines of battle after they have already begun to form?

*In re Walt Disney Co. Derivative Litig.*, 1997 WL 118402, at *3.

27. *See, e.g., Kindt v. Lund*, 2001 WL 1671438, at *1 (Del.Ch.) ("[A]llowing full-blown discovery ... would eviscerate the very purpose of having a special committee."); *Abbey v. Computer & Communications Tech. Corp.*, 1983 WL 18005, at *1–*2 (Del.Ch.) ("[I]f a derivative plaintiff is to be permitted full discovery ... what would be the need for having the special litigation committee procedure to begin with?").

tion is substantive and not procedural.[28] This substantive body of law includes *Zapata* and the cases that implement its teachings.[29]

I, however, am unconvinced that the California State Derivative Plaintiffs have persuaded the California state court of their view. To the contrary, it appears possible that the only reason that discovery is proceeding in the California State Derivative Action is that the Special Litigation Committee did not follow the correct procedure to bring its motion to stay before the court there. Once the procedural issue governing the method by which the Oracle Special Litigation Committee should enter its appearance in the California State Derivative Action is rectified, I presume that the California state court will give full effect to the substantive Delaware law addressing stay requests made by special litigation committees. Of course, if it does otherwise, it will be even more clear why a dismissal of the Delaware action is inappropriate and might threaten Oracle with substantial prejudice.

## II.

For all the foregoing reasons, the Delaware Derivative Plaintiffs' motion to dismiss under Rule 41(a)(2) is hereby denied. This action is hereby stayed until further order of the court, provided that the Special Litigation Committee shall report to the court on the progress of its work on or before September 15, 2002. IT IS SO ORDERED.

---

**28.** *See Draper v. Gardner Defined Plan Trust,* 625 A.2d 859, 865 & n. 9 (Del.1993); *Kamen v. Kemper Fin. Servs. Inc.,* 500 U.S. 90, 96–97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991); *Abrams v. Koether,* 766 F.Supp. 237, 248 n. 13 (D.N.J.1991) (applying Delaware law to determine whether a plaintiff may take discovery of a Delaware corporation relating to demand futility while a Rule 23.1 motion was pending).

**29.** Any reasonable reader of *Zapata* and the legal commentary discussing it must recognize the substantive nature of the policy choice made in that case, which, among other things, subjected special litigation committees to a form of judicial review more intense than the business judgement standard of review. Within its domain, *Zapata* is as substantive as *Aronson v. Lewis,* 473 A.2d 805 (Del.1984), which addresses when demand is excused.